Argued and submitted May 7, judgment of conviction reversed in part; otherwise affirmed, case remanded to the circuit court July 5, 1996

## STATE OF OREGON,
*Respondent,*

*v.*

## GREGORY PAUL WILSON,
*Appellant.*

## (CC C9208-34764; SC S41047)

918 P2d 826

Richard L. Wolf, Oregon City, argued the cause and filed the brief for appellant.

David B. Thompson, Assistant Attorney General, Salem, argued the cause for respondent. With him on the brief were Theodore R. Kulongoski, Attorney General, and Janet A. Metcalf and Robert B. Rocklin, Assistant Attorneys General.

Before Carson, Chief Justice, and Gillette, Van Hoomissen, Fadeley, Unis,* Graber, and Durham, Justices.

GRABER, J.

___

* Unis, J., retired June 30, 1996, and did not participate in this decision.

## GRABER, J.

A jury convicted defendant of nine counts of aggravated murder, one count of murder, two counts of kidnapping in the first degree, one count of kidnapping in the second degree, one count of assault in the third degree, and one count of abuse of a corpse in the second degree. All the crimes related to a single victim.

After the jury answered in the affirmative the penalty-phase questions submitted to it in accordance with ORS 163.150(1)(b),[1] the trial court merged the aggravated murder counts with the murder, kidnapping, and assault counts and sentenced defendant to death for each of the nine aggravated murder counts, as provided in ORS 163.150(1)(f). The court also sentenced defendant to 30 days' imprisonment for abuse of a corpse.

This case comes to us on automatic and direct review. ORS 163.150(1)(g). Defendant seeks reversal of his convictions or, in the alternative, asks us to vacate the death sentence. For the following reasons, we reverse his convictions pertaining to the aggravated murder and murder counts and affirm as to the remaining counts.

The basic facts pertinent to this case, and defendant's role in the murder of Misty Largo, are set forth in *State v. Charboneau*, 323 Or 38, 40-41, 913 P2d 308 (1996), and need not be repeated here. Such additional facts as may be necessary to the discussion will appear below.

---

[1] ORS 163.150(1)(b) provides:

"Upon the conclusion of the presentation of evidence, the court shall submit the following issues to the jury:

"(A) Whether the conduct of the defendant that caused the death of the deceased was committed deliberately and with the reasonable expectation that death of the deceased or another would result;

"(B) Whether there is a probability that the defendant would commit criminal acts of violence that would constitute a continuing threat to society;

"(C) If raised by the evidence, whether the conduct of the defendant in killing the deceased was unreasonable in response to the provocation, if any, by the deceased; and

"(D) Whether the defendant should receive a death sentence."

## ADMISSIBILITY OF PLEA AGREEMENT

■ Defendant assigns as error the admission in evidence of certain portions of a plea agreement between the state and Marvin Al-Tai-Juan Smith. For the reasons that follow, we conclude that this assignment of error is well taken.

Shortly after defendant's trial, Grant Steven Charboneau was tried for his role in the murder of Largo. A jury convicted Charboneau of one count of aggravated murder, six counts of murder, one count of felony murder, two counts of kidnapping in the first degree, one count of kidnapping in the second degree, one count of assault in the third degree, and one count of abuse of a corpse in the second degree. *Charboneau*, 323 Or at 40. On review, this court reversed Charboneau's convictions pertaining to the murder counts, on the following ground:

> "During the guilt phase of the trial, Smith testified in the state's case-in-chief. On direct examination, Smith testified that he was one of the people who found Largo under the Marquam Bridge on July 25, 1992, and forced her back to defendant's house. Smith was one of the two people responsible for making sure that Largo did not leave the house the next day. Smith saw Largo being beaten and interrogated. He watched defendant and Wilson kill Largo; he held her legs down while defendant and Wilson strangled her. When defendant and Wilson went to dispose of Largo's body, Smith remained at the house to clean it up in an effort to remove traces of the crime. Smith also testified that he was arrested for his participation in the murder of Largo and that he had entered a plea agreement with the state in exchange for his testimony at defendant's trial.
>
> "Defense counsel cross-examined Smith about the plea agreement to demonstrate Smith's motive to testify favorably for the state. * * * In exchange for his testimony at defendant's trial, Smith testified, he pleaded guilty to one count of felony murder for which the state would recommend a sentence of no more than 121 months in prison.[2]

---

[2] At defendant's trial, Smith did not testify as to the specific details of his plea agreement with the state. However, he did testify that he had "made a deal" with the state in exchange for his testimony at defendant's trial.

"On redirect examination, the state offered Smith's plea agreement as evidence. The state's purpose was to rehabilitate Smith by showing that he had a motive to testify truthfully; the plea agreement provided that, if he did not, the agreement would be 'null and void.'

"Defendant objected to the admission of the following emphasized portions of the plea agreement (among others):

*"The primary reason for this agreement is that, based on Smith's statements and on its investigation, the State believes that this charge accurately reflects the role Smith played in the death of Misty Largo.*

"\* \* \* \* \*

"Smith's representation that Misty Largo's death was primarily accomplished by other persons is a basic premise for this agreement. *Although the state has reason to believe this is true,* if that premise is demonstrated to be incorrect, this agreement is null and void and shall have no effect except that any statements by Smith pursuant to this agreement and any evidence derived from them shall be admissible in court.' (Emphasis added)." 323 Or at 42-43.

The trial court had admitted those portions of the plea agreement, and this court held that it was error to have done so. "A witness's testimony or an exhibit may not, explicitly and directly, contain an opinion as to a trial witness's credibility." *Id.* at 48. Because the emphasized portions of the plea agreement did contain such an opinion from the state as to Smith's credibility, admissibility of those portions of the plea agreement was error. *Ibid.*

This court also concluded in *Charboneau* that the improper admission of the plea agreement constituted reversible error:

"Smith was the *only* witness who testified to the details of defendant's personal participation in Largo's murder. He thus provided the crucial evidence that tied defendant to the commission of the murder. In the circumstances, the error was prejudicial with respect to defendant's convictions of aggravated murder, murder, and felony murder." *Id.* at 50 (emphasis in original).

Defendant's situation is nearly identical to Charboneau's with respect to this assignment of error. In this case, after defense counsel cross-examined Smith, the state introduced into evidence the same plea agreement that it had introduced in *Charboneau*. That plea agreement contained the same paragraphs that this court, in *Charboneau*, held were inadmissible. That being so, the same error that occurred in *Charboneau* occurred here.

■ Moreover, in this case, as in *Charboneau*, Smith was the only eyewitness to the murder who testified in detail as to defendant's personal participation in the murder. Thus, Smith provided the crucial evidence that tied defendant to the murder. In the circumstances, the error was prejudicial with respect to defendant's convictions for aggravated murder and murder. Those convictions must be reversed.

■ In *Charboneau*, this court concluded by holding that the erroneous admission of part of Smith's plea agreement was harmless error as to the defendant's convictions for kidnapping, assault, and abuse of a corpse, reasoning:

> "*Numerous* witnesses *other than Smith* testified to defendant's involvement in those other crimes. The evidence concerning defendant's guilt of those crimes is extensive and compelling, and it does not depend on Smith's credibility. We conclude that there is little likelihood that the erroneous admission of part of Smith's plea agreement with the state affected the verdict as to defendant's convictions for kidnapping, assault, and abuse of a corpse. *See State v. Pinnell*, 319 Or 438, 446 n 9, 877 P2d 635 (1994) ('[u]nder state law, an error is harmless if there is "little likelihood that the error affected the verdict" '). We also conclude, beyond a reasonable doubt, that the erroneous admission of part of Smith's plea agreement did not contribute to those convictions. *See Chapman v. California*, 386 US 18, 24, 87 S Ct 824, 17 L Ed 2d 705 (1967) (stating that federal constitutional error is deemed harmless if the appellate court concludes beyond a reasonable doubt that the error did not contribute to the conviction)." 323 Or at 50-51 (emphasis in original).

In all respects material to the resolution of this assignment of error, the record in the present case is the same as the record in *Charboneau*. Accordingly, we reach the same conclusion:

The erroneous admission of part of Smith's plea agreement did not contribute to defendant's convictions for kidnapping, assault, and abuse of a corpse.

Because we do not reverse defendant's convictions for kidnapping, assault, and abuse of a corpse on this ground, we go on to consider the remaining assignments of error.

## PRELIMINARY ORIENTATION FOR JURORS

Defendant assigns as error the trial court's exclusion of defendant from a preliminary orientation for potential jurors in his case. We conclude that the error does not require reversal of defendant's remaining convictions.

On September 20, 1993, a special venire of 114 jurors was called for a preliminary orientation concerning defendant's case. During that preliminary orientation, the trial court asked potential jurors whether any of them knew the lawyers, parties, or witnesses. The judge also said to the jurors:

> "[S]ome of the crimes that the defendant, Mr. Wilson, here is charged with are Aggravated Murder cases. Now, Aggravated Murder cases carry the potential of a death sentence. I'll get into that in much more detail."

The lawyers then elected to leave the courtroom, and the venire received preliminary instructions about the charges against defendant, the state's burden of proof, and the responsibilities of jurors. The potential jurors took an oath to answer honestly all questions asked of them concerning their qualifications as jurors. The potential jurors then filled out lengthy written questionnaires, which had been prepared by the parties. The proceedings lasted approximately one and one half hours.

Defendant was not present during the foregoing proceedings. At the time, he was in custody.

In the trial court, defendant asserted that he had a right to be present at the preliminary orientation.[3] The trial court disagreed, stating:

---

[3] It is not clear from the record what relief defendant sought in order to remedy the alleged error—whether a new trial, dismissal of the charges, or something else.

"Let me rule on that. * * * [The preliminary orientation] is pretty much of an administrative act. [Defendant] certainly has a right to be present during the voir dire, which is going to be commenced in a few minutes. [The preliminary orientation] was simply an introduction and I do not find that is a critical stage of the proceeding."

Defendant argues that his exclusion from the preliminary orientation violated his state statutory and state and federal constitutional rights.[4] He urges this court to conclude that his exclusion from the preliminary orientation was a "structural error"[5] that requires reversal of his convictions.

■ We begin with defendant's argument that, under Oregon law, his exclusion from the preliminary orientation for jurors requires reversal of his convictions. *See Barcik v. Kubiaczyk*, 321 Or 174, 186, 895 P2d 765 (1995) (noting that this court addresses state law claims before addressing federal law claims). At oral argument before this court, the state conceded that the trial court erred by excluding defendant from the preliminary orientation in the specific circumstances of this case. We agree. We thus turn to the question whether that error requires reversal.

■ Defendant argues that his exclusion is *reversible* error, because the preliminary orientation

"was the very first opportunity that the prospective jury would have to view Mr. Wilson. First impressions are extremely important in everyday life and equally in this context. The jurors that actually sat to decide Mr. Wilson's fate, may have assumed that his absence was intentional, and that he simply could not be bothered to appear for his

---

[4] Specifically, defendant argues that his exclusion from the preliminary orientation violated ORS 136.040, Article I, sections 10, 11, and 20, of the Oregon Constitution, and his due process rights under the Fifth and Fourteenth Amendments to the United States Constitution.

[5] This court has not decided whether Oregon state law should recognize the "structural defect" versus "trial error" distinction created by the United States Supreme Court in *Arizona v. Fulminante*, 499 US 279, 306-10, 111 S Ct 1246, 113 L Ed 2d 302 (1991). *See State v. Williams*, 313 Or 19, 56-60, 828 P2d 1006 (Unis, J., dissenting) (comparing standards of review of trial error under Oregon and federal law), *cert den* 506 US 858 (1992). Nor do we need to decide that issue today. As we explain in the text below, 323 Or at 507-09, under federal law, the error alleged in this case is not a "structural defect" that requires automatic reversal of defendant's convictions.

first scheduled court date. The jury could have drawn an extremely negative inference from his nonappearance without ever knowing he desired to attend this proceeding.

"* * * * *

"* * * Let there be no mistake about it; all the members of this Court who have been trial judges know that, at that first introduction when the summary of the charge is read to the jury, the majority of the prospective jurors are looking directly at the defendant. [Defendant] submits that they do that in order to get a sense of who it is they will be asked to sit in judgment of."

At oral argument before this court, defendant also argued that his exclusion from the preliminary hearing affected his ability to confer with his lawyer as to how he wished to use his peremptory challenges.

We find nothing in the record of the preliminary orientation to suggest that the potential jurors would have drawn any unfavorable inference about defendant from his absence. Neither the trial judge nor the lawyers called attention to the fact that defendant was not present. Nothing in the record suggests that the potential jurors thought that defendant had a right to be present and chose not to attend. To the contrary, the trial judge's opening remarks suggested to the potential jurors that the preliminary orientation was a routine administrative matter.

After the preliminary orientation, the trial court conducted an individual *voir dire* of each potential juror. Defendant was present throughout that process. The trial judge introduced each potential juror to defendant at that time.[6]

---

[6] The *voir dire* was conducted over a six-day period. Fifty-four potential jurors were examined for a jury of twelve, plus two alternates. Each individual examination began with the judge's greeting the juror with a statement to this effect:

"Good morning, [juror]. You have your questionnaire there in front of you and you have a glass of water. I introduced the attorneys [at the preliminary orientation]. I did not have an opportunity to introduce the defendant, and the defendant is Mr. Gregory Paul Wilson in the sweater."

The judge then reminded each juror that he or she was to answer truthfully the questions asked, introduced the juror to the lawyers again, and then allowed the *voir dire* to begin.

Defendant was present during *voir dire* , made a "first impression" on the potential jurors, and made decisions about the jurors' impressions of him. During *voir dire* , defendant had the opportunity to confer with his lawyer as to how he wished to use his peremptory challenges, while he simultaneously assessed the demeanor of each potential juror.

Additionally, the information that the trial court gave to the potential jurors concerning the charges against defendant, the state's burden of proof, and the responsibility of jurors was substantively the same as the instructions that the judge gave the impaneled jurors at the beginning of defendant's trial. We also note that neither the prosecutors *nor* defense counsel thought that it was necessary to remain at the preliminary orientation when that information was given to the potential jurors. The decision of defense counsel to leave voluntarily undercuts defendant's later contention that his absence was prejudicial. To the extent that defendant argues that his exclusion from the preliminary orientation hampered his ability to make peremptory challenges, we note that that alleged effect could have occurred only during the very brief period while defense counsel was present, before counsel left.

In the light of the foregoing facts, we conclude that there is "little likelihood that the error affected the verdict." *See State v. Pinnell*, 319 Or 438, 446 n 9, 877 P2d 635 (1994) (stating the quoted Oregon standard for harmless error (internal quotation marks omitted)). That being so, reversal of defendant's remaining convictions is not required under the usual state law standard.

■ We turn to consideration of harmless error under federal law. Generally, federal constitutional error is deemed harmless if the appellate court concludes beyond a reasonable doubt that the error did not contribute to the conviction. *See Chapman v. California*, 386 US 18, 24, 87 S Ct 824, 17 L Ed 2d 705 (1967) (stating standard). However, in *Arizona v. Fulminante*, 499 US 279, 306-10, 111 S Ct 1246, 113 L Ed 2d 302 (1991), the Supreme Court held that certain constitutional errors are "structural defects" "which defy 'harmless-error' standards." Such "structural defects" require automatic reversal, because they "affect[ ] the framework within

which the trial proceeds, rather than simply \* \* \* the trial process itself." *Id.* at 310.

■ Defendant asserts that his exclusion from the preliminary orientation of potential jurors was a "structural error" that requires automatic reversal under federal law. Specifically, he argues that his exclusion violated his due process right to be present at trial, under the Fifth and Fourteenth Amendments to the United States Constitution, "as well as the right of confrontation which has been extended to all trial proceedings," presumably under the Sixth Amendment to the United States Constitution. The Supreme Court's holdings are to the contrary of defendant's position.

■■ The deprivation of a defendant's due process right to be present at trial is subject to a harmless error analysis. *See Snyder v. Massachusetts*, 291 US 97, 114-18, 54 S Ct 330, 78 L Ed 674 (1934) (denial of a defendant's due process right to be present at trial was subjected to a harmless error analysis); *Rushen v. Spain*, 464 US 114, 117-18 n 2, 104 S Ct 453, 78 L Ed 2d 267 (1983) (stating that a defendant's rights to be present at all critical stages of a trial and to be represented by counsel, "as with most constitutional rights, are subject to harmless-error analysis" and citing *Snyder* with approval); *Fulminante*, 499 US at 306-07 (citing *Rushen* and listing "denial of a defendant's right to be present at trial" as a "constitutional error [that] can be harmless"). The deprivation of a defendant's Sixth Amendment Confrontation Clause rights likewise is subject to a harmless error analysis. *See Delaware v. Van Arsdall*, 475 US 673, 682, 106 S Ct 1431, 89 L Ed 2d 674 (1986) (denial of Confrontation Clause right to cross-examine witness "does not fit within the limited category of constitutional errors that are deemed prejudicial in every case"); *Fulminante*, 499 US at 307-08 (citing *Van Arsdall* as an example of "trial error" to which harmless error analysis applies); *Idaho v. Wright*, 497 US 805, 827, 110 S Ct 3139, 111 L Ed 2d 638 (1990) (suggesting that violation of a defendant's Confrontation Clause rights would be subject to a harmless error analysis).

Defendant's assertion that his absence from the preliminary orientation *automatically* requires reversal of his convictions under the United States Constitution is not well

taken. Applying the usual federal harmless error analysis, we conclude beyond a reasonable doubt that the error did not contribute to those convictions. *See Chapman*, 386 US at 24 (stating standard).

## ADMISSIBILITY OF HEARSAY STATEMENTS

During the guilt phase of defendant's trial, the trial court admitted, over defendant's objection, certain hearsay statements by Charboneau as related by a witness, Skyler Dorsey. At the time of Largo's murder, Dorsey was living at Charboneau's house. Dorsey participated in, and witnessed, some of the abuse of Largo. However, Dorsey was not at the house when the murder occurred; she returned to the house soon after Largo's body had been removed.

Dorsey asked Charboneau what had happened to Largo. Dorsey testified that Charboneau made these statements to her: that Largo had been given a nitroglycerine tablet dissolved in water; that Charboneau and defendant had placed a bag over Largo's head and an electrical wire around Largo's neck; that he and defendant had taken turns pulling on the wire; that eventually Largo had died; and that defendant had said that they needed to make Largo "unrecognizable." Dorsey also testified that Charboneau was sober and "seemed pleased with himself" when he spoke with her.

In the trial court, defendant argued that Charboneau's statements as related by Dorsey were inadmissible hearsay because, to the extent that they related *defendant's* criminal behavior, they were not against *Charboneau's* penal interest. Defendant also argued that admission of those statements would violate defendant's right to confront witnesses under Article I, section 11, of the Oregon Constitution, and the Sixth Amendment to the United States Constitution.[7] The trial court concluded that Charboneau's statements were admissible under OEC 804(3)(c) and that their

---

[7] Article I, section 11, of the Oregon Constitution, provides in part:

"In all criminal prosecutions, the accused shall have the right * * * to meet the witnesses face to face * * *."

The Sixth Amendment to the United States Constitution provides in part:

"In all criminal prosecutions, the accused shall enjoy the right * * * to be confronted with the witnesses against him * * *."

admission would not run afoul of defendant's state and federal constitutional rights. Defendant contends that the trial court's rulings were erroneous and repeats the arguments that he made below.

We first consider defendant's statutory argument; then we address his state constitutional argument; and, finally, we examine his federal constitutional claim. *See State v. Nielsen*, 316 Or 611, 618, 853 P2d 256 (1993) (delineating that method of analysis).

■ OEC 804(3) provides in part:

"The following are not excluded [as inadmissible hearsay] if the declarant is unavailable as a witness:

"* * * * *

"(c) A statement which was at the time of its making so far contrary to the declarant's pecuniary or proprietary interest, or so far tended to subject the declarant to civil or criminal liability, or to render invalid a claim by the declarant against another, that a reasonable person in the declarant's position would not have made the statement unless the person believed it to be true."

Under OEC 804(3)(c), hearsay statements that expose the declarant to criminal liability are admissible if the declarant is unavailable and if the statements are so against the declarant's penal interest that a reasonable person in the declarant's position would not have made the statements unless that person believed those statements to be true. *See Nielsen* 316 Or at 618-21 (undertaking such an analysis).

■■ Under OEC 804(1), a declarant is unavailable if the declarant "[i]s exempted by ruling of the court on the ground of privilege from testifying concerning the subject matter of a statement." The proponent of the evidence "ha[s] the burden of proving * * * that [the declarant is] unavailable." *Nielsen*, 316 Or at 618. A declarant's unavailability is a preliminary question of fact for the trial court to decide under OEC 104(1). *Ibid.* In reviewing a trial court's preliminary finding of fact,

---

The Confrontation Clause of the Sixth Amendment is made applicable to the states through the Due Process Clause of the Fourteenth Amendment. *Pointer v. Texas*, 380 US 400, 403-06, 85 S Ct 1065, 13 L Ed 2d 923 (1965).

we view the record in the manner most consistent with that ruling and draw all reasonable inferences and credibility choices that the court could have made in support of its ruling. *Ibid.*

 Before Dorsey testified in front of the jury as to Charboneau's statements, the state presented that testimony in an offer of proof. At the outset of the offer of proof, Charboneau's lawyer appeared in court and exercised his client's right not to testify, based on Charboneau's privilege to be free from compelled self-incrimination under Article I, section 12, of the Oregon Constitution, and the Fifth Amendment to the United States Constitution.[8] The trial court found that Charboneau was unavailable to testify because of the exercise of that privilege.

Defendant argues that that finding was erroneous, because, under OEC 804(2), Charboneau was not unavailable. OEC 804(2) provides:

"A declarant is not unavailable as a witness if the declarant's exemption, refusal, claim of lack of memory, inability, or absence is due to the procurement or wrongdoing of the proponent of the declarant's statement for the purpose of preventing the witness from attending or testifying."

___

[8] Article I, section 12, of the Oregon Constitution, provides in part:

"No person shall be * * * compelled in any criminal prosecution to testify against himself."

The Fifth Amendment to the United States Constitution provides in part:

"No person * * * shall be compelled in any criminal case to be a witness against himself * * *."

The Fifth Amendment privilege against self-incrimination is made applicable to the states through the Due Process Clause of the Fourteenth Amendment. *Malloy v. Hogan*, 378 US 1, 84 S Ct 1489, 12 L Ed 2d 653 (1964).

Charboneau was tried after defendant was tried. If Charboneau had testified at defendant's trial, his statements could have implicated him in the murder of Largo. Accordingly, Charboneau's lawyer invoked Charboneau's right to remain silent. A criminal defendant may invoke the right to be free from compelled self-incrimination through counsel. *See State v. Simonsen*, 319 Or 510, 514, 878 P2d 409 (1994) ("Defendant had a right to have [an] invocation by his lawyer of his right to remain silent honored, at least until he was able to consult with the lawyer, or, in the alternative, he waived his right to such a consultation after being fully apprised of the situation that actually existed.").

Specifically, defendant asserts that the state's decision to try him before it tried Charboneau and its decision not to offer Charboneau leniency in exchange for testimony at defendant's trial amounted to "wrongdoing" under OEC 804(2).

At trial, defendant did not cite OEC 804(2) and did not argue that Charboneau's absence was "due to the * * * wrongdoing of the [state] for the purpose of preventing the witness from attending or testifying." Nor did defendant suggest below that the state had any obligation to try Charboneau first or to offer Charboneau a "deal" in exchange for testimony against defendant. Thus, the argument that defendant raises on appeal was not preserved. *See State v. Isom*, 313 Or 391, 406, 837 P2d 491 (1992) ("[a]n objection on one ground is not sufficient to preserve some other objection"). This is not an error "apparent on the face of the record" that this court may consider on review notwithstanding a defect in presentation at trial. *See State v. Brown*, 310 Or 347, 355-56, 800 P2d 259 (1990) (discussing when this court will exercise its discretion to review unpreserved errors). Accordingly, we will not consider this argument on the merits.

██ ██ We turn to the remaining requirements of OEC 804(3)(c). As noted above, in the trial court, defendant argued that Charboneau's statements were not against his penal interest, and thus were not admissible under OEC 804(3)(c). This court's decision in *Nielsen* compels a different conclusion. Charboneau's statements plainly were against his penal interest. Dorsey testified that Charboneau told her how he and defendant had murdered Largo and how they later had plotted to maim her corpse. Those statements subjected Charboneau to criminal liability. In *Nielsen*, this court held that, under OEC 804(3)(c), a declarant's hearsay statements that were against the declarant's penal interest and that also inculpated a criminal defendant were admissible in the defendant's criminal trial. *See Nielsen*, 316 Or at 620-21 (observing that "[the declarant] incriminated herself and [the] defendant" through hearsay statements, and holding that those statements were admissible in the defendant's prosecution).[9]

---

[9] After this court decided *Nielsen*, the United States Supreme Court decided *Williamson v. United States*, 512 US 594, 114 S Ct 2431, 129 L Ed 2d 476 (1994).

■ Finally, the record supports the trial court's conclusion that a reasonable person in the declarant's position would not have made those statements unless he believed that they were true. Charboneau made the statements in his own home, to a friend. *Compare Nielsen*, 316 Or at 620 (stating that "[t]his court previously has noted its concern over inculpatory statements made by persons in custody"); *see also* OEC 804 Commentary (1981) ("A statement admitting guilt and implicating another person, made while [the defendant is] in custody, may well spring from a desire to curry favor with the authorities and hence fail to qualify as being against the declarant's interest. On the other hand, the same words spoken under different circumstances, e.g., to an acquaintance, would have no difficulty in qualifying." (citation omitted)). At the time Charboneau made the statements, he was sober, and he made those statements without protracted questioning. *See Nielsen*, 316 Or at 620 (the fact that hearsay statements were made in the absence of extensive police questioning is an indicator of their reliability). Charboneau's statements concerning Largo's murder were quite detailed and were made on the day of the murder. *See ibid.* (the fact that hearsay statements describe the declarant's role in committing a crime is an indicator of their reliability). Finally, Charboneau's statements admitted his equally culpable involvement in the murder, rather than trying to shift the blame to defendant. *See ibid.* (the fact that the declarant's hearsay statements describe the declarant as equally culpable in committing a crime is an indicator of their reliability).

---

In that case, the Court held that, under FRE 804(3)(c), which is identical in all relevant respects to OEC 804(3)(c), a hearsay declarant's non-self-inculpatory statements were inadmissible even though those statements were part of a broader narrative that was self-inculpatory. 129 L Ed 2d at 483. That holding was based on the Court's reading of the *text* of FRE 804(3)(c).

The United States Supreme Court's interpretation of FRE 804(3)(c) in *Williamson* does not control this court's interpretation of OEC 804(3)(c). *See State v. O'Key*, 321 Or 285, 292 n 7, 899 P2d 663 (1995) (when this court interprets a provision of the Oregon Evidence Code, it is not bound by a decision from the United States Supreme Court, made after the adoption of the Oregon Evidence Code, interpreting a parallel provision of the Federal Rules of Evidence "even though the Oregon Evidence Code is modeled on the Federal Rules of Evidence"). Indeed, when this court interprets an Oregon statute, that interpretation becomes part of the statute as if written into it at the time of enactment. *See S-W Floor Cover Shop v. Natl. Council on Comp. Ins.*, 318 Or 614, 622, 872 P2d 1 (1994) (applying that principle).

The trial court did not err when it determined that Charboneau's hearsay statements were admissible under OEC 804(3)(c). We next address defendant's constitutional claims.

Under Article I, section 11, this court has adopted the reasoning of the United States Supreme Court in *Ohio v. Roberts*, 448 US 56, 100 S Ct 2531, 65 L Ed 2d 597 (1980), "to decide whether a defendant's * * * confrontation rights have been satisfied when an out-of-court statement by one not testifying at trial is admitted." *State v. Stevens*, 311 Or 119, 140, 806 P2d 92 (1991). *See also Nielsen*, 316 Or at 622-23 (so stating). In *Stevens*, this court described the *Roberts* test as follows:

> "[T]he declarant must '[i]n the usual case' be unavailable, and the statement must have 'adequate indicia of reliability.' 448 US at 65-66. When the statement falls within a 'firmly rooted hearsay exception,' courts will deem it to be reliable. 448 US at 66. In the alternative, reliability may be supported by 'a showing of particularized guarantees of trustworthiness.' *Ibid.*" 311 Or at 140-41.

*See also Nielsen*, 316 Or at 623 (quoting that passage from *Stevens* with approval).[10]

The first question is whether the declarant is unavailable under Article I, section 11. Our previous discussion shows that, because he was asserting his constitutional right against self-incrimination, Charboneau would not testify at defendant's trial. Charboneau therefore was unavailable as required by Article I, section 11.

As to the second requirement, "indicia of reliability," the state does not argue that a statement against penal interest falls within a "firmly rooted hearsay exception" under

---

[10] This court's holding in *Nielsen*—applying the test articulated by the United States Supreme Court in *Ohio v. Roberts* to analyze indicia of reliability and trustworthiness under Article I, section 11—is not modified by subsequent decisions of the United States Supreme Court. *See State v. Caraher*, 293 Or 741, 749, 653 P2d 942 (1982) ("[w]hen this court gives Oregon law an interpretation corresponding to a federal opinion, our decision remains the Oregon law even when federal doctrine later changes").

Article I, section 11. Rather, the state argues that Charboneau's hearsay statements contain "particularized guarantees of trustworthiness," *Stevens*, 311 Or at 141, and we agree.

In *Nielsen*, this court held that the admission of an unavailable hearsay declarant's statement against penal interest that also inculpated the defendant contained adequate indicia of reliability, because particularized guarantees of trustworthiness were present. 316 Or at 624. Accordingly, the court held that admission of the statement did not violate defendant's Confrontation Clause rights under Article I, section 11, of the Oregon Constitution. "The guarantee is in the fact that the statement is strongly against declarant's penal interest and no countervailing motivation to fabricate is shown to be in operation." *Id.* at 623.

That "against interest" guarantee was not affected by the circumstances surrounding Charboneau's statements. As noted, he was not in police custody, he was under no pressure to make the statements, he was speaking with a friend, he made the statements on the same day the murder occurred, and he did not try to shift the blame for the murder to defendant. The statements were detailed. There is no indication in the record that Charboneau made the statements to Dorsey, inculpating himself and defendant, because of intimidation or a desire to "curry favor" with Dorsey or anyone else. Indeed, there is no indication in the record that Charboneau expected that the crime would be discovered. The trial court did not err in concluding that Charboneau's statements contained adequate indicia of reliability under Article I, section 11.

In summary, the admission of Charboneau's statements pursuant to OEC 804(3)(c) did not violate defendant's rights under Article I, section 11, of the Oregon Constitution.

We also disagree with defendant's assertion that the admission of Charboneau's hearsay statements violated defendant's Confrontation Clause rights under the Sixth Amendment. Under the federal analysis, the test to determine whether such a violation occurred is set forth in *Roberts*, discussed above. *See also Wright*, 497 US at 814 ("In

*Ohio v. Roberts*, we set forth 'a general approach' for determining when incriminating statements admissible under an exception to the hearsay rule also meet the requirements of the Confrontation Clause.").

Charboneau's assertion of his privilege against compelled self-incrimination established his unavailability. *See Douglas v. Alabama*, 380 US 415, 419-20, 85 S Ct 1074, 13 L Ed 2d 934 (1965) (the hearsay declarant's assertion of privilege against self-incrimination makes the declarant unavailable for Confrontation Clause purposes). Again, we need not consider whether a statement against penal interest falls within a "firmly rooted" hearsay exception, because adequate "particularized guarantees of trustworthiness" are present.

As explained above, under this court's Article I, section 11, analysis, the very fact that a declarant made a statement against penal interest is an indicator of that hearsay statement's reliability, even though the statement inculpates another person as well. In *Williamson v. United States*, 512 US 594, 114 S Ct 2431, 129 L Ed 2d 476, 485 (1994), the United States Supreme Court has signaled that only "truly self-inculpatory" statements accompanied by particularized guarantees of trustworthiness would be sufficient to make the statements admissible under the Confrontation Clause of the Sixth Amendment.

In *Williamson*, the Court considered whether an unavailable declarant's confession to the police, which inculpated a criminal defendant, was admissible in that defendant's criminal prosecution. The Court held that, under FRE 804(3)(c), the statements in the confession were inadmissible. 129 L Ed 2d at 482-83. The Court's decision in *Williamson* was a statutory one that did not implicate the Confrontation Clause. *See id.* at 482-84 (the Court noted that the defendant raised both statutory and constitutional arguments and based its conclusion on "the policy expressed in the statutory text"). However, the Court did say that "[t]he fact that a person is making a broadly self-inculpatory confession does not make more credible the confession's non-self-inculpatory parts." *Id.* at 482-83. Nonetheless, as the Court explained in

*Williamson*, the fact that a hearsay statement may be inadmissible under FRE 804(3)(c) as a matter of statutory construction does *not* preclude its admission under the Confrontation Clause. *See id.* at 483 ("Congress certainly could, subject to the constraints of the Confrontation Clause, make statements admissible based on their proximity to self-inculpatory statements").

For Sixth Amendment purposes, " 'particularized guarantees of trustworthiness' must be shown from the totality of the circumstances * * * that surround the making of the statement and that render the declarant particularly worthy of belief." *Wright*, 497 US at 819. As noted, *Williamson* appears to preclude reliance on the general "against penal interest" nature of a statement, without more, as an indicator of reliability with respect to portions of the statement inculpating someone other than the declarant, at least insofar as the statement simultaneously tends to exculpate the declarant. We therefore examine only the totality of the other circumstances that surrounded the making of the statements in question. We conclude that the circumstances surrounding Charboneau's hearsay statements render the declarant, and his statement, particularly worthy of belief:

♦ *Where the statements were made*: Charboneau made the statements in his own home.

♦ *When the statements were made*: Charboneau made the statements on the same day that the murder occurred.

♦ *To whom the statements were made*: Charboneau made the statements to a friend.[11] There is no indication that he made the statements inculpating defendant in an attempt to curry favor with Dorsey or anyone else.

---

[11] This factor appears to be especially important. In *Williamson*, 129 L Ed 2d at 483, for example, the Court cited *Lee v. Illinois*, 476 US 530, 541, 106 S Ct 2056, 90 L Ed 2d 514 (1986); *Bruton v. United States*, 391 US 123, 136, 88 S Ct 1620, 20 L Ed 2d 476 (1968); and Justice Harlan's concurrence in *Dutton v. Evans*, 400 US 74, 98, 91 S Ct 2120, 27 L Ed 2d 213 (1970), for the proposition that the veracity of an accomplice's *jailhouse confession* is inherently suspect. In *Lee*, 476 US at 541-42, the Court held that the accomplice's confession to the police was presumptively unreliable. Even so, the Court recognized that such a statement "may nonetheless meet Confrontation Clause reliability standards if it is supported by a 'showing of

◆ *What prompted the statements*: Charboneau made the statements in response to Dorsey's questions, but her questioning was neither leading nor prolonged. Nor did Dorsey question Charboneau on behalf of the state.

◆ *How the statements were made*: Charboneau made the statements voluntarily. At the time, he was sober and appeared pleased with himself. *See Wright*, 497 US at 821-22 (noting that, in child sexual abuse cases, the "mental state of the declarant" is an indicator of the reliability of the declarant's statements).

◆ *What the statements contained*: Charboneau's statements were so detailed as to suggest personal knowledge of the matters involved. Additionally, the statements admitted Charboneau's equal culpability in the crimes, rather than trying to shift blame to defendant. In other words, nothing about the statements would tend to reduce Charboneau's potential punishment for the crimes described. *Compare Williamson*, 129 L Ed 2d at 485 (stating that not all of the declarant's statements were demonstrated to be admissible because, in the circumstances there, "[a] reasonable person in [his] position might even think that implicating someone else would decrease his practical exposure to criminal liability").

Because of the foregoing circumstances, admission of Charboneau's hearsay statements as related by Dorsey did not violate defendant's rights under the Sixth Amendment to the United States Constitution.

---

particularized guarantees of trustworthiness.' " *Id.* at 543 (citation omitted). *Bruton*, 391 US at 124-25 & n 1, involved a jailhouse confession in response to police questioning, before which *Miranda* warnings had not been given. In *Dutton*, 400 US at 88-90, the Court held that the admission of an accomplice's out-of-court statements inculpating the defendant in the murder of which he was accused did not violate the defendant's Confrontation Clause rights, because the statements contained indicia of reliability. The cited passage from Justice Harlan's concurrence opined that, as a matter of due process, "a confession of an accomplice *resulting from formal police interrogation* cannot be introduced as evidence of the guilt of an accused, absent some circumstance indicating authorization or adoption." *Id.* at 98 (Harlan, J., concurring in result) (emphasis added).

## REMAINING ASSIGNMENTS OF ERROR

Defendant raises several additional assignments of error that allegedly occurred during the guilt phase of the trial. We have considered defendant's remaining assignments of error pertaining to the guilt phase of the trial and every argument made in support thereof. We find no error based on those assignments of error.

Defendant also raises several additional assignments of error pertaining to the penalty phase of the trial. Because we reverse defendant's convictions for aggravated murder, those assignments of error are moot, and we need not consider them.

## DISPOSITION

The judgment of conviction is reversed with respect to the charges of aggravated murder and murder. The judgment of conviction is otherwise affirmed. The case is remanded to the circuit court for further proceedings.