Argued and submitted September 13, 2013, affirmed November 12, 2015

Marie ROWEN,
wife;
and Personal Representative of
the Estate of Frank J. Rowen,
Deceased,
*Plaintiffs-Appellants,*

*v.*

Jonathan GONENNE, MD;
Eugene Gastroenterology Consultants, PC;
and Oregon Endoscopy Center, LLC,
*Defendants-Respondents.*

Lane County Circuit Court
161021046; A149358

362 P3d 694

Maureen Leonard argued the cause and filed the briefs for appellants.

Lindsey H. Hughes argued the cause for respondents. With her on the brief were Hillary A. Taylor and Keating Jones Hughes, P.C.

Before Nakamoto, Presiding Judge, and Egan, Judge, and Lagesen, Judge.*

LAGESEN, J.

---

* Lagesen, J., *vice* Armstrong, P. J.

**LAGESEN, J.**

Complications with post-polypectomy bleeding from a polypectomy performed in 2009 by gastroenterologist Dr. Gonenne left Franklin Rowen paralyzed from the waist down. Rowen and his wife, Marie, plaintiffs in this matter, sued Gonenne, as well as Gonenne's professional corporation, Eugene Gastroenterology Consultants, P.C., and the surgical facility where the procedure was performed, Oregon Endoscopy Center ("the Center"). Rowen alleged claims for negligence, and Marie alleged a derivative claim for loss of consortium. A jury returned a verdict for defendants. Plaintiffs have appealed, assigning error to three evidentiary rulings by the trial court: (1) the trial court's denial of plaintiffs' motion to exclude evidence of a "benchmarking study" regarding post-polypectomy bleeding, which plaintiffs contend was inadmissible under Oregon's statutory privilege for materials and communications associated with the medical "peer review" process, ORS 41.675; (2) the trial court's exclusion of evidence of a 2010 study identifying certain risk factors in post-polypectomy bleeding; and (3) the trial court's decision to permit defendants to cross-examine one of plaintiffs' witnesses, a vascular surgeon who had operated on Rowen before the polypectomy, as to whether he had observed any bleeding issues. Finding no error by the trial court, we affirm.

## I. BACKGROUND

In May 2009, Rowen's primary care doctor became concerned that Rowen was anemic and had blood in his stool. He referred Rowen to Gonenne, a gastroenterologist and shareholder in Eugene Gastroenterology Consultants, P.C., for a consultation. After that consultation, Gonenne recommended a colonoscopy. Rowen declined the procedure at that time.

Rowen continued to show symptoms of anemia into late July, and his primary care doctor again referred Rowen to Gonenne. Rowen met with Gonenne and the doctor again recommended a colonoscopy. At that point, Rowen agreed, and the procedure was scheduled for 9:30 a.m. on July 30

at the Center.[1] In accordance with clinic policy regarding routine colonoscopies, Gonenne did not advise Rowen to discontinue his regular doses of blood thinners, specifically, the anti-platelet drugs aspirin and Plavix.[2] Through July 29, Rowen took his aspirin and Plavix as usual.

The colonoscopy was performed on July 30, as planned. The procedure revealed nine polyps, including several large, sessile polyps of benign appearance, in the ascending colon. Those polyps were removed from Rowen's colon. That afternoon, Gonenne decided that Rowen was at an increased risk for bleeding, and he directed that Rowen stop taking his aspirin and Plavix. Rowen was discharged from the facility and sent home.

In the middle of the night, Rowen experienced bleeding in his colon. His wife drove him to the hospital around 2:30 a.m., and he was admitted. That afternoon, Gonenne performed a second colonoscopy, with the intent of cauterizing the bleeding sites. By 11:00 a.m. the next day, on August 1, Rowen was found to have up to 1800 cubic centimeters of blood in his colon. That loss of blood volume caused a contemporaneous drop in Rowen's blood pressure. That drop in pressure, which lasted for a prolonged period of time, limited the circulation of blood to Rowen's spine. By noon, Rowen was unable to move his legs.

---

[1] The Center is a surgical facility, owned in part by Gonenne, where surgical procedures are performed. Although the Center employs support staff—including nurses—the facility employs no physicians. Physicians at Eugene Gastroenterology Consultants make the decisions related to patient care at the Center.

[2] A memorandum dated January 9, 2002, and authored by Dr. Knecht, set forth the Eugene Gastroenterology policy with respect to aspirin and Plavix. It provided, in full:

"I believe that we all agreed (but this memo is to make sure we did), that our patients do not need to go off ASA [aspirin], Plavix, or nonsteroidal agents in general, prior to routine colonoscopy [examination of the lower intestinal tract] and EGD [examination of the upper digestive tract]. For some reason, I am still getting asked frequently about these agents prior to routine procedures, and if you all agree that is what we agreed upon, I am going to reinform Linda Jo and Allan that these agents do not need to be discontinued, and they therefore do not need to continue to ask us whether we want patients on or off these agents prior to procedures. Coumadin, of course, is another story, and this will be discussed with Linda Jo and Allan.

"Get back to me on this at your earliest convenience."

At 12:22 p.m., one of Gonenne's colleagues, Dr. Kay, performed a third colonoscopy on Rowen, in an attempt to "clip off" the vessel that was bleeding into Rowen's colon. At 3:00 p.m., the doctors gave Rowen a unit of platelets, which was intended to "counteract the effects of" the aspirin and Plavix. Ultimately, Rowen survived, but with impaired lower body function and no use of his legs.

The following year, plaintiffs sued Gonenne, Eugene Gastroenterology Consultants, and the Center, alleging that they were negligent in the following particulars: (1) failing to discontinue Rowen's aspirin and Plavix at least five days prior to the polypectomy procedure; (2) failing to consult with Rowen's other health-care providers about the propriety of discontinuing those medications; (3) failing to perform a diagnostic colonoscopy without a polypectomy; and (4) failing to schedule the polypectomy procedure to accommodate a presurgery consultation with Rowen's other health-care providers and to allow time for the medications to leave Rowen's system.[3] Plaintiffs requested $1.85 million for past and future medical expenses, $3 million in noneconomic damages for plaintiff Franklin Rowen, and $1.5 million in noneconomic damages for plaintiff Marie Rowen.

At trial, plaintiffs' theory was that defendants breached the standard of care when, pursuant to the Center's policy, they declined to discontinue Rowen's aspirin and Plavix prescriptions in advance of his surgery. Moreover, even assuming that application of defendants' policy would have been appropriate if Rowen had undergone only a low-risk colonoscopy, plaintiffs argued that it was negligent for defendants to perform a polyp-removal surgery—which carries a high risk for bleeding—without discontinuing Rowen's anti-platelet medications seven to 10

---

[3] With respect to Eugene Gastroenterology Consultants and the Center, plaintiff additionally alleged that those defendants were negligent in (1) failing to have policies and procedures in place—or, alternatively, failing to follow existing policies—to verify whether Rowen was still taking aspirin and/or Plavix; (2) failing to have policies and procedures in place—or, alternatively, failing to follow existing policies—to verify whether there had been any consultation with Rowen's other treating physicians about whether he should discontinue those medications prior to his colonoscopy and polypectomy; and (3) failing to reschedule Rowen's surgery until after his aspirin and Plavix medications had been discontinued for at least five days.

days before the procedure. In support of that theory, plaintiffs relied on guidelines developed by the American Society of Gastrointestinal Endoscopy (ASGE). When Gonenne found the polyps in Rowen's colon during the routine colonoscopy, the proper course of action, according to plaintiffs, was to delay the polyp-removal surgery, in the light of the risk posed by the aspirin and Plavix in Rowen's system.

The primary defense theory was that there is no medical consensus as to whether a patient should remain on, or discontinue, anti-platelet medications in the days preceding a colonoscopy and polypectomy. Defendants pointed out that either course of action available to Gonenne—moving forward with the polyp-removal procedure without discontinuing aspirin and Plavix, or delaying the procedure long enough for those drugs to leave Rowen's system—carried a distinct set of risks. Specifically, although defendants acknowledged that performing the procedure without discontinuing aspirin and Plavix could create a "chance of bleeding," they contended that such bleeding is "unusual" and "typically controllable," and that bleeding of the kind Rowen experienced is "extraordinarily rare, if not unheard of." On the other hand, defendants pointed out that discontinuing the aspirin and Plavix medications before performing the procedure would have increased Rowen's risk for a heart attack, stroke, or pulmonary embolism—particularly in light of Rowen's other significant health conditions, which included diabetes, hypertension, and chronic obstructive pulmonary disease (COPD) from smoking.

Defendants' secondary theory was that, even if Gonenne's conduct did fall below the standard of care, Rowen's injuries were caused by bleeding from an artery—as opposed to bleeding from a vein,[4] and the presence or absence of either aspirin or Plavix (or both) in a patient's system has no bearing on the body's ability to repair bleeding from an artery, because the high pressure in the arterial system "pushes the blood out faster than platelets would be able to develop [a] clot."

The jury found for defendants. Plaintiffs appeal.

---

[4] The arterial system carries oxygenated blood to the tissues; the venous system brings that blood back to the heart.

## II. ANALYSIS

As noted, plaintiffs assign error to three different evidentiary rulings by the trial court: (1) admission into evidence of the benchmarking study that reflected a relatively low rate of polypectomy bleeding events at the Center; (2) exclusion of evidence of a 2010 clinical study showing increased bleeding risks in polypectomy patients using aspirin and Plavix; and (3) the decision to permit defendants to question Rowen's vascular surgeon on cross-examination about the fact that the surgeon kept Rowen on aspirin and Plavix during his vascular surgeries and that that surgeon observed no abnormal bleeding during those surgeries. With respect to their first challenge, plaintiffs argue that the benchmarking study should have been excluded under the medical peer review statute, ORS 41.675. With respect to their second challenge, plaintiffs contend that the 2010 study should have been admitted both as relevant to the element of causation, and to impeach Gonenne. Finally, with respect to their third challenge, plaintiffs argue that defendants should not have been permitted to question Rowen's vascular surgeon, because the standard of care applicable to vascular surgery is irrelevant to the standard of care applicable to a polypectomy. For the reasons that follow, we conclude that plaintiffs have not demonstrated any error in the trial court's rulings and, accordingly, affirm.

### A. *Benchmarking Study*

The focus of plaintiffs' first assignment of error is the trial court's admission into evidence of a document entitled "Common Factors in post-Polypectomy Bleeding Patients Benchmarking Study June 2008."[5] Before trial, plaintiffs moved *in limine* to exclude "any evidence" of the study "because the study lacks scientific validity, risks confusing the jury, and any probative value the study may have is outweighed by its prejudicial effect." They argued that the

---

[5] We understand plaintiffs' challenge to the trial court's admission of "the study" to be a challenge to the admission of the document that plaintiffs attached to their motion *in limine*, and to testimony about that document. That document describes a multistate, 18-month-long research process—a process which the document describes as "the study." For clarity, our references in this opinion to "the study" are to the document at issue, rather than to the research project that is described in that document.

study was too unreliable to qualify for admission as scientific evidence, and that the study was inadmissible hearsay to the extent that defendants intended to introduce it as substantive evidence of the rates of post-polypectomy bleeding at the Center.

In support of the motion, plaintiffs attached a copy of the six-page study that they requested be excluded. Relying on deposition testimony by the Center's nurse manager, Dee Tvedt, plaintiffs explained that that study resulted from Tvedt's participation in a "benchmarking group of GI clinics across the country." The group had a study coordinator. For a year and a half, the participating clinics reported post-polypectomy bleeds at their facilities. Tvedt obtained the information that she submitted to the benchmarking group from a file that she maintained on doctors' reports of colonoscopy related complications. While compiling that information, Tvedt did not review patient medical records to determine whether there were any incidents of post-polypectomy bleeding that had not been reported to her. From the information obtained during the study, the benchmarking group identified common factors that contributed to post-polypectomy bleeding. Relying on the evidence on how the study was conducted, plaintiffs argued that the benchmarking group's methods made the study too unreliable to be introduced into evidence.

In response to plaintiffs' motion to exclude the study, defendants explained that they intended to call the nurse who worked on the study to testify about what the study was and what its results were, and that Gonenne would testify that he knew about the study and that it influenced his decision to go forward with the polypectomy on Rowen. The trial court denied plaintiffs' motion, ruling that the evidence of the study was admissible because Gonenne had relied on it in deciding to proceed with the polypectomy on Rowen, and, for that reason, was probative of Gonenne's decision-making process.

Midtrial, plaintiffs attempted once again to convince the trial court to exclude the benchmarking study. This time, they advanced an entirely different theory of inadmissibility: The study was inadmissible under Oregon's

statutory privilege for material and communications related to the medical "peer review" process, ORS 41.675.[6] Specifically, plaintiffs contended that the study represented an "oral communication[] or written report[] to a peer review body" within the meaning of ORS 41.675(2), and, therefore, was subject to exclusion under ORS 41.675(3). Plaintiffs did not introduce additional foundational evidence in support of their new theory. Instead, they pointed to the following notation on the last page of the six-page document that they had attached to their initial motion *in limine*:

---

[6] ORS 41.675 provides, in full:

"(1) As used in this section, 'peer review body' includes tissue committees, governing bodies or committees including medical staff committees of a health care facility licensed under ORS chapter 441, medical staff committees of the Department of Corrections and similar committees of professional societies, a health care service contractor as defined in ORS 750.005, an emergency medical service provider as defined in ORS 41.685 or any other medical group or provider of medical services in connection with bona fide medical research, quality assurance, utilization review, credentialing, education, training, supervision or discipline of physicians or other health care providers or in connection with the grant, denial, restriction or termination of clinical privileges at a health care facility. 'Peer review body' also includes utilization review and peer review organizations.

"(2) As used in subsection (3) of this section, *'data' means all oral communications or written reports to a peer review body, and all notes or records created by or at the direction of a peer review body, including the communications, reports, notes or records created in the course of an investigation undertaken at the direction of a peer review body.*

"(3) *All data shall be privileged and shall not be admissible in evidence in any judicial, administrative, arbitration or mediation proceeding.* This section shall not affect the admissibility in evidence of records dealing with a patient's care and treatment, other than data or information obtained through service on, or as an agent for, a peer review body.

"(4) A person serving on or communicating information to any peer review body or person conducting an investigation described in subsection (1) of this section shall not be examined as to any communication to or from, or the findings of, that peer review body or person.

"(5) A person serving on or communicating information to any peer review body or person conducting an investigation described in subsection (1) of this section shall not be subject to an action for civil damages for affirmative actions taken or statements made in good faith.

"(6) Subsection (3) of this section shall not apply to proceedings in which a health care practitioner contests the denial, restriction or termination of clinical privileges by a health care facility or the denial, restriction or termination of membership in a professional society or any other health care group. However, any data disclosed in those proceedings shall not be admissible in any other judicial, administrative, arbitration or mediation proceeding."

(Emphases added.)

**"Results Reported:**

"√  Discussed at Quality Management Committee on

"√  Reviewed and Approved by the Governing Body on

"√  Discussed with the Staff On

"8/11/2008dt"

Noting that reference to the Center's Quality Management Committee, plaintiffs urged the trial court to find that the document itself was a report to a peer review body, namely, the Center's Quality Management Committee.

In response, defendants stated that they did not understand the study to be material covered by the "peer review" privilege. The trial court took the matter under advisement overnight. The next morning, the court denied the motion without further comment on the record, apart from noting that it recognized plaintiffs' objections. Gonenne subsequently testified that morning that he relied on the study in making the decision to go forward with the polypectomy on Rowen.[7] Defendants later called Tvedt and introduced the first two pages of the study through her.[8] Tvedt explained how the study was conducted and her role in gathering the information from the Center and submitting it to the benchmarking group. During plaintiffs' cross-examination of Tvedt, she explained that it would have been "the usual protocol" for her to present the results of the study to the Center's Quality Management Committee. On redirect examination, she testified further that she discussed the study "with all of the staff" at the Center, not just the Quality Management Committee and the governing board.

On appeal, plaintiffs do not assign error to the trial court's denial of their initial motion *in limine* regarding the

---

[7] The study reflected that the Center "was in the lowest 1/4 of facility incidents for post polypectomy bleeding" during the study period, but that the Center needed to develop a reliable reporting system to track post-polypectomy bleeding in its patients. It recommended continuing to study post-polypectomy bleeding for another 18 months "to do a three year comparison of the common factors showing a 50% or more occurrence rate."

[8] Plaintiffs later submitted the remaining four pages of the document into evidence.

study. Instead, they assign error only to the trial court's denial of their midtrial motion to exclude the study on the ground that it was privileged under ORS 41.675. They argue that the study is a "written report[ ] to a peer review body" within the meaning of ORS 41.675(2) because it "was prepared for and reviewed by defendant the Center's quality management committee." In response, defendants argue, among other things, that plaintiffs did not develop sufficient foundational evidence under OEC 104 to demonstrate that the study was, as a factual matter, the type of document covered by the statutory privilege.

We agree with plaintiffs that a "written report[ ] to a peer review body" under ORS 41.675 means a written report that is "prepared for" a peer review body. In other words, we understand the legislature to have employed the word "to" within the broader statutory phrase "oral communications and written reports *to* a peer review body" as "a function word to indicate object of address." *Webster's Third New Int'l Dictionary* 2401 (unabridged ed 2002). We also agree that ORS 41.675, properly construed, would require the exclusion of a written report that was, as a factual matter, prepared for and reviewed by a peer review body, such as the Center's Quality Management Committee.[9] However, our agreement with plaintiffs' interpretation of ORS 41.675 does not lead to the conclusion that the trial court erred when it denied plaintiffs' motion to exclude the study. The difficulty for plaintiffs is that the record that they created in support of their motion *in limine* does not compel a factual finding that the study was a document that was "prepared for" or addressed "to" the Center's Quality Management Committee. For that reason, our standard of review dictates that we affirm the trial court's denial of plaintiffs' motion to exclude the study.

To explain: Defendants disputed whether the study was the type of document covered by the ORS 41.675 privilege. Given the parties' dispute on that point, whether the study was in fact the type of document to which the privilege

_____

[9] ORS 41.675(1) defines "peer review body" broadly to include, among other groups, "committees of * * * any other medical group or provider of medical services in connection with * * * quality assurance[.]"

applies (that is, whether the study was, in fact, a written report "to" the Center's Quality Management Committee) was a preliminary question of fact to be resolved by the trial court under OEC 104(1).[10] *See State v. Langley*, 314 Or 247, 263, 839 P2d 692 (1992) ("Determining whether a privilege applies to proffered evidence is a preliminary fact question decided by a trial court under OEC 104(1)."). As the proponent of the application of the privilege, plaintiffs bore the burden of proving that the study was, as a factual matter, the type of document covered by the privilege. *Groff v. S.I.A.C.*, 246 Or 557, 566, 426 P2d 738 (1967). Under OEC 104(1), plaintiffs bore the burden of producing evidence that persuaded the trial court that the study more likely than not was a written report to the Center's Quality Management Committee. *See State v. Carlson*, 311 Or 201, 209, 808 P2d 1002 (1991) (holding that trial court "is to use the preponderance standard in deciding preliminary questions of fact under OEC 104(1)").

On review of a trial court's determination of a preliminary question of fact under OEC 104(1), "we view the record in the manner most consistent with that ruling and draw all reasonable inferences and credibility choices that the court could have made in support of its ruling." *State v. Wilson*, 323 Or 498, 511, 918 P2d 826 (1996). Where the trial court does not make explicit factual findings, and the evidence would permit the facts to be decided more than one way, we presume that the trial court found the facts in a manner consistent with the court's ultimate ruling. *Carlson*, 311 Or at 213-14. "Unless the evidence in a case is such that the trial court as finder of fact could decide a particular question in only one way, we are bound by the trial court's factual findings, including a finding that a party's evidence is not sufficiently persuasive." *Prime Properties, Inc. v. Leahy*, 234 Or App 439, 449, 228 P3d 617 (2010) (internal quotation marks omitted).

As noted, the trial court denied without comment plaintiffs' request to exclude the benchmarking study under

---

[10] OEC 104(1) states, in relevant part:

"Preliminary questions regarding the qualification of a person to be a witness, the existence of a privilege or the admissibility of evidence shall be determined by the court[.]"

ORS 41.675. Presuming, as we must, that the trial court found the facts in a manner consistent with that ruling, we presume that the trial court found that it was not persuaded that the study was, in fact, a written report to the Center's Quality Management Committee—plaintiffs' asserted basis for the application of the statutory privilege.[11] The question, then, is whether the evidence that plaintiffs presented in support of their claim of privilege was such that the trial court was required to find that the study was a written report to the Center's Quality Management Committee.

It was not. At the time the court ruled on the motion, the only evidence connecting the study to the Center's Quality Management Committee was the notation that the study had been "√ Discussed at Quality Management Committee on." But that notation—which is ambiguous as to whether the study or the document had, in fact, been discussed with the committee—does not compel a factual finding that the study was a written report that was prepared for and directed to the Quality Management Committee.[12] It may have been, but it also may have been a publicly available document that, at some point, was discussed with the Center's Quality Management Committee.[13] Certainly,

---

[11] In their motion, plaintiffs asked the trial court to conclude that the Center's Quality Management Committee was a "peer review body" under ORS 41.675, and that the six-page document attached to their motion *in limine* was a "written report" to that body. Plaintiffs did not argue, and do not argue on appeal, that the national benchmarking group that conducted the study was a peer review body, and that the study would be covered by the ORS 41.675 privilege as a report created by or for that body.

[12] Below, plaintiffs asserted that the notation "8/11/2008dt" at the bottom of the list of groups contained in the "Results Reported" section of the study meant that the study had, in fact, been discussed with the Center's Quality Management Committee on 8/11/2008. Although that is one possible inference from that notation, it is not the only way to understand it.

[13] Plaintiffs do not argue that a publicly disseminated or otherwise nonconfidential written report that was not prepared for a peer review body would become privileged simply by virtue of the fact that it was shared with a peer review body. Although evidence that the report was communicated to the peer review body would appear to fall within the privilege for communications to a peer review body, nothing in the terms of the statute suggests that the legislature intended for the privilege to apply to reports that were not created incident to the peer-review process, either as reports to a peer review body or reports created by a peer review body. Here, defendants did not seek to introduce any evidence regarding communications about the study to the Quality Management Committee; they sought only to introduce evidence of the study to explain what information

the evidence that the document was produced as part of a nationwide study could cause a reasonable factfinder to have doubts as to whether the document was one that was prepared for the Center's Quality Management Committee. The notations on the document indicating that it also was shared with staff—not only with the Quality Management Committee—could raise similar doubts.

The same is true even if we take into account the additional evidence about the study that plaintiffs introduced at trial (although plaintiffs did not renew their motion after they introduced that additional evidence, or suggest to the trial court that that new evidence would compel a factual finding that the study was a document that had been prepared for the Quality Management Committee). That evidence, like the notation on the study, at most, indicates that the study was discussed with the Center's Quality Management Committee, as well as with the rest of the Center's staff. But it does not compel a finding that the Quality Management Committee was the body to which the study was directed. Under those circumstances, the trial court did not have to be persuaded that it was more likely than not that the study was a written report to the Center's Quality Management Committee, and did not err in denying plaintiffs' motion to exclude the document as privileged under ORS 41.675.

## B. *2010 Study*

Plaintiffs' second assignment of error asserts that the trial court "erred when it excluded evidence of a 2010 study showing an increased risk of bleeding in polypectomy patients using aspirin and Plavix." Plaintiffs argue that the trial court should have admitted evidence of the 2010 study because it was relevant to causation and also to impeach Gonenne.

---

Gonenne took into account in deciding to go forward with the polypectomy when he did. Any evidence that the results of the study were communicated to the Center's Quality Management Committee, or that the results were considered by the Quality Management Committee, was introduced by plaintiffs, not by defendants. As a result, to the extent plaintiffs' assignment of error can be construed to challenge the admission of that evidence, plaintiffs invited the error and are not entitled to reversal.

To the extent that plaintiffs contend that the trial court erred by not admitting the 2010 study as substantive evidence of causation, their assignment of error is not preserved. Plaintiffs did not offer the study as an exhibit in support of their case on causation. As a result, the trial court was not asked to rule on whether plaintiffs could introduce the study as substantive evidence of causation. Instead, plaintiffs sought to impeach Gonenne by cross-examining him about the study during the defense case. Although plaintiffs mentioned "causation" in making their case for using the study to cross-examine Gonenne, the context of that reference indicates that plaintiffs were seeking to use the study to attack the credibility of Gonenne's testimony regarding the absence of studies affirmatively showing a causal link between the use of aspirin and Plavix and post-polypectomy bleeding.[14]

To the extent that plaintiffs assign error to the trial court's denial of their request to cross-examine Gonenne about the 2010 study, we conclude that the trial court did not err. Although the trial court did not explain its ruling, in the light of the parties' competing arguments before the trial court, we understand the trial court to have excluded the evidence about the 2010 study under OEC 403.[15] That is

_____

[14] In seeking to introduce evidence of the 2010 study, plaintiffs' counsel explained how he wanted to use the evidence:

"Based on the doctor's testimony that he just gave, I want to talk to the jury about the 2010 article that was published in the *Journal of Gastrointestinal Endoscopy*, which finds an increased risk of bleeding in post-polypectomy patients.

"It's a 2010 study, but we're talking about whether or not there [are] risks. And his testimony was he thought aspirin was not going to be an increased risk, but later the studies showed that aspirin wasn't at an increase risk.

"And he just testified that the studies may show that later in the future on [Plavix] and aspirin together, and I would like the jury to know that there are now studies that have been documented that show that there is an increased risk of bleeding in patients who *** are taking aspirin and Plavix after polyp removal."

[15] OEC 403 provides that relevant evidence may be excluded on the ground that "its probative value is substantially outweighed by the danger of unfair prejudice, confusion of the issues, or misleading the jury, or by considerations of undue delay or needles presentation of cumulative evidence." In opposing plaintiffs' request to cross-examine Gonenne regarding the 2010 study, defendants pointed out that plaintiffs, not defendants, were the ones who had introduced the testimony that plaintiffs sought to impeach, and then argued:

a ruling that we review for abuse of discretion. *McCathern v. Toyota Motor Corp.*, 332 Or 59, 71, 23 P3d 320 (2001). Under that standard, "'[w]e simply determine whether, on the facts of the particular case, the trial court's ruling was within the reasonable or permissible range. We need not determine whether [the] ruling was the only one possible.'" *Page v. Cushing*, 80 Or App 690, 698, 742 P2d 323, *rev den*, 302 Or 159 (1986) (quoting *Carter v. Moberly*, 263 Or 193, 201, 501 P2d 1276 (1972)).

We are not persuaded that the trial court abused its discretion. Plaintiffs sought to introduce the evidence about the 2010 study to impeach testimony from Gonenne that they, themselves, elicited on cross-examination. In that testimony, Gonenne acknowledged that studies that had been published before he operated on Rowen suggested a link between post-polypectomy bleeding and the use of aspirin and Plavix, but speculated that there may never be proof of that link. Evidence of the 2010 study could have impeached Gonenne by suggesting to the jury that he was not knowledgeable about the most recent research, but that evidence also ran the risk of misleading the jury into thinking that the reasonableness of Gonenne's conduct should be evaluated in the light of information that was not available at the time that he operated on Rowen. Although the trial court permissibly could have concluded that the probative value of the study as impeachment evidence was not substantially outweighed by the potential for unfair prejudice, it was not unreasonable for the court to conclude otherwise.

C.  *Testimony Related to Vascular Surgery*

Plaintiffs' third assignment of error challenges the trial court's decision to permit defendants to cross-examine Rowen's vascular surgeon about the facts that the surgeon left Rowen on aspirin and Plavix during Rowen's vascular surgeries, and that the surgeon had not observed any bleeding problems during those surgeries, which had been

---

"And I didn't open that door. He did. And I don't think it justifies—I think the prejudice that could do to our case of later studies, this is not a central issue in the case, and if the doctor were asked, he's going to say that the aspirin studies—and the showing that the aspirin was not a risk, were all done before 2009."

performed before Rowen's polypectomy. Plaintiffs argue that that testimony was not relevant because "evidence of an appropriate medical practice for a vascular procedure is not relevant to appropriate medical practice for a colonoscopy involving polyp removal surgery." They argue further that, even if the evidence was probative for any other reason, the trial court abused its discretion by not excluding it.

In response, defendants do not dispute that the evidence was not relevant regarding the standard of care, but argue that it was relevant for a number of other reasons, including causation, noting that the fact that Rowen had not previously had bleeding problems as a result of being on aspirin and Plavix was probative of whether Rowen's post-polypectomy bleeding was caused by the fact that he was on that drug combination or was, instead, caused by something else. They argue further that the trial court did not abuse its discretion in admitting the evidence.

We agree with defendants. The record reflects that the evidence was neither offered nor received for purposes of demonstrating the standard of care. Beyond that, the evidence was probative of causation; it also was probative of whether Rowen's medical history should have put defendants on notice that Rowen, in particular, was a person for whom the combination of aspirin and Plavix was likely to cause bleeding problems. And, the trial court was within its discretion to conclude that the probative value of the evidence was not substantially outweighed by the danger of unfair prejudice although, as with the evidence of the 2010 study, a reasonable factfinder permissibly could have reached a different conclusion.

Affirmed.