Argued and submitted October 4, affirmed December 13, 2000,
petition for review denied April 17, 2001 (332 Or 56)

## STATE OF OREGON,
*Respondent,*

*v.*

## JEFFREY LEROY JONES,
*Appellant.*

(97CR0749; CA A102069)

15 P3d 616

Jesse Wm. Barton, Deputy Public Defender, argued the cause for appellant. With him on the brief was David E. Groom, Public Defender.

Robert M. Atkinson, Assistant Attorney General, argued the cause for respondent. With him on the brief were Hardy Myers, Attorney General, and Michael D. Reynolds, Solicitor General.

Before De Muniz, Presiding Judge, and Haselton and Wollheim, Judges.

HASELTON, J.

## HASELTON, J.

Defendant appeals from a judgment of conviction and sentence for six counts of aggravated murder. ORS 163.095.[1] Defendant contends that the trial court erred in admitting into evidence, over defendant's hearsay and Confrontation Clause objections, portions of a confession by defendant's alleged accomplice implicating defendant in the murder. We affirm.

In April 1997, defendant, his companion Duane Tregeagle, and two other people stole a car in Seattle, Washington, and drove south. They stopped in Salem and committed a burglary, during which they obtained a 0.25 caliber pistol. Eventually, they wound up in the Coos Bay-North Bend area, where Tregeagle crashed the stolen car.

Stranded, the four walked to their North Bend hotel, after which defendant and Tregeagle made plans to steal a car so they could return home. They went to a local car wash where Ronald Shellenbarger was washing his Mustang and asked Shellenbarger if he could give them a ride. He agreed.

Shortly thereafter, the Mustang was seen near a boat ramp in Coos Bay's Empire district, where it jumped over a curb and crashed into a fence. By that time, Shellenbarger had been killed by a single, short-range gunshot to the head with the stolen 0.25 caliber pistol.

Following the crash at the boat ramp, the Coos Bay police arrived on the scene. Defendant and Tregeagle initially claimed to be good Samaritans helping Shellenbarger. They were taken to the police station, where they were questioned about the accident. As defendant and Tregeagle sat alone, an officer overheard defendant say to Tregeagle that

---

[1] Defendant was charged pursuant to a 19-count amended indictment that alleged, *inter alia*, aggravated murder (ORS 163.095), murder (ORS 163.115), felony murder (ORS 163.115), robbery in the first degree (ORS 164.415), kidnapping in the first degree (ORS 163.235), kidnapping in the second degree (ORS 163.225), and unauthorized use of a vehicle (ORS 164.135). Defendant was tried before a jury, which found him guilty on all 19 counts. Thirteen of those counts were merged with the aggravated murder counts, and defendant was convicted of and sentenced to six concurrent life sentences for aggravated murder. No party questions the propriety of that sentence in light of *State v. Barrett*, 331 Or 27, 10 P3d 901 (2000), and we express no view in that regard.

they "shouldn't have gotten involved in a murder." That prompted further questioning by Coos Bay police and Coos County sheriff detectives, and defendant eventually told them that Tregeagle had killed Shellenbarger. Defendant further stated that, while he had agreed to participate in the carjacking, he had played no role in Shellenbarger's death and was unaware of any plan to shoot or kill Shellenbarger.

After the detectives completed interviewing defendant, they interviewed Tregeagle. When asked why he shot Shellenbarger, Tregeagle looked down at the floor and did not respond. He was then lodged overnight at the Coos County Jail. The next morning, Coos County Detective Zanni again interviewed Tregeagle. During that interview, Tregeagle admitted that he shot Shellenbarger in an effort to conceal the robbery of the Mustang. Most of Tregeagle's remarks to Zanni were self-inculpatory: Tregeagle admitted that he had fired the fatal shot, stated that he was solely responsible for the killing, and indicated that defendant "really didn't know what he was getting into." Tregeagle also avowed his willingness to go to jail and said that the police "could throw him in the electric chair because it didn't bother him to kill somebody."

Tregeagle's statement was not, however, purely self-inculpatory. In particular, Tregeagle told Zanni that, before asking Shellenbarger for a ride, he and defendant had discussed the possibility that Tregeagle would shoot Shellenbarger during the carjacking. According to Tregeagle, defendant said that he was "down for whatever"—that is, he would support Tregeagle and "watch his back" in whatever decision he made, including the potential killing.

Before trial, the state filed a "Motion to Admit Statements Made by Defendants," seeking to admit, *inter alia*, Tregeagle's statements to the police inculpating defendant. The parties stipulated that Tregeagle was unavailable for purposes of OEC 804(3) and agreed that the purely self-inculpatory portions of his statement were admissible under that provision as declarations against penal interest. Defendant argued, however, that Zanni could not recount those portions of Tregeagle's hearsay statement that inculpated defendant. Defendant relied primarily on two arguments. First, those

portions of Tregeagle's statement were not admissible under the exception for statements against penal interest. OEC 804(3)(c). Second, regardless of OEC 804(3)(c), because Tregeagle was not available for cross-examination, the hearsay recounting of those remarks would offend the confrontation protections of the Oregon and United States Constitutions.

The trial judge subsequently issued a letter opinion, ruling that Zanni's hearsay recounting of Tregeagle's remarks inculpating defendant would be admissible:

"The confession Tregeagle gave took full responsibility for killing Shellenbarger. He was the shooter. He did not try to shift the blame to the defendant or implicate him in the killing. In fact, Tregeagle tried to protect the defendant from responsibility for the killing. The charges against Tregeagle have been resolved by his plea of guilty to aggravated murder and his sentence to life without parole. Obviously, the defendant is not being tried jointly with Tregeagle.

"Since the confession was clearly against the penal interests of Tregeagle and he was not trying to curry favor with the authorities or shift the blame to the defendant, and the facts related by him were based on his personal knowledge, the court does not find that the other factors showing the statement was made in jail to the police 24 hours after the murder detract from its admissibility as a statement against penal interest."

At trial, on direct examination by the prosecutor, Zanni recounted Tregeagle's confession:

"Q. Did—did Mr. Tregeagle then begin to tell you about the events leading up to the shooting of Ronald Shellenbarger?

"A. Actually he did. * * * And then basically he just kind of looked at us and said, 'I shot the guy, I'll tell you that. I shot the guy for the car.'

"* * * * *

"Q. Now, did Mr. Tregeagle did he say whether or not [the killing] was the plan of he and the Defendant, or did he say that this was what his plan was?

"A.  Um, we asked him specifically about that. He said it was his plan. He had planned it out, but he had asked [defendant] if he was going to be there for him. That he was. That it was his plan, however [defendant] was willing to go along with it and they would play off his plan. We asked him specifically if [defendant] told us that he didn't know anything about that, is that true? And he basically said if [defendant] said he didn't know anything about that, that would be cool with him. There was no reason for two of them being charged with this when it was his plan. He'd take the whole rap.

"I asked him again specifically, 'Is that a true story—that [defendant] said he didn't know anything about it? He didn't know anything about the car jacking? Is that a true statement?' Again, he indicated that would be cool with him, because there's just no reason for both of them to go down for the same charge because he was the one who did the shooting.

"I asked him a third time, basically was that a true statement—that [defendant] didn't know anything about the car jacking. And he looked at me and said emphatically, 'No.'

"Q.  What did he say the Defendant knew?

"A.  He indicated that [defendant] knew and was aware that they were going to go out and take a car. He said that [defendant] knew what they were going to do. He knew that they were going to shoot somebody and take the car to keep from getting caught. And basically knew that they had a chance to get out of the area by doing that, and that was what they had—were going to do.

"Q.  And how did Mr. Tregeagle say that he knew that was what the defendant knew?

"A.  Basically he told me he remembered specifically asking [defendant] if he was there for him, even if he had to shoot somebody. And [defendant] indicated to him that he was there for him. That he'd cover his back."

The state also offered into evidence a tape recording of subsequent comments by Tregeagle, confirming the substance of his confession. In those comments, as in his initial confession, Tregeagle assumed primary responsibility and generally attempted to discount defendant's involvement. Defendant

was ultimately convicted of six counts of aggravated murder and 13 other related charges. *See* 171 Or App at 377 n 1.

On appeal, defendant challenges the admissibility of Zanni's testimony on both statutory and constitutional grounds. Defendant advances three distinct, but related, arguments:

First, defendant argues that Tregeagle's statement was inadmissible hearsay. Specifically, defendant argues that, because Tregeagle had already confessed to the murder by the time he implicated defendant, the portion of Tregeagle's statement "implicating defendant in his plan to rob and kill" was not against Tregeagle's penal interest, OEC 804(3)(c), and thus was inadmissible hearsay.[2]

Second, defendant argues that he was denied his right to confront Tregeagle, in violation of Article I, section 11, of the Oregon Constitution.[3] Defendant contends that, under the framework for constitutional analysis set forth in *State v. Wilson*, 323 Or 498, 918 P2d 826 (1996), Tregeagle's statements inculpating defendant lacked the "particularized guarantees of trustworthiness" necessary to pass constitutional muster.

Finally, defendant asserts that admission of Tregeagle's remarks implicating defendant would violate the Confrontation Clause of the federal constitution.[4] Defendant particularly invokes the analysis of a plurality of the Court in *Lilly v. Virginia*, 527 US 116, 119 S Ct 1887, 144 L Ed 2d 117

---

[2] OEC 804(3)(c) states:

"A statement which was at the time of its making so far contrary to the declarant's pecuniary or proprietary interest, or so far tended to subject the declarant to civil or criminal liability, or to render invalid a claim by the declarant against another, that a reasonable person in the declarant's position would not have made the statement unless the person believed it to be true. A statement tending to expose the declarant to criminal liability and offered to exculpate the accused is not admissible unless corroborating circumstances clearly indicate the trustworthiness of the statement."

[3] Article I, section 11, of the Oregon Constitution, states, in relevant part: "In all criminal prosecutions, the accused shall have the right * * * to meet the witnesses face to face[.]"

[4] The Sixth Amendment to the United States Constitution states: "In all criminal prosecutions, the accused shall enjoy * * * the right to be confronted with the witness against him[.]"

(1999), and contends that that analysis repudiates our holdings applying the federal Confrontation Clause, including, most recently, *State v. Franco*, 151 Or App 472, 950 P2d 348 (1997), *rev den* 326 Or 465 (1998).[5]

■　　We address those arguments, adhering to the method prescribed in *State v. Nielsen*, 316 Or 611, 618, 853 P2d 256 (1993): "First we consider defendant's arguments under the pertinent statute or other state law; second, we analyze defendant's state constitutional claims; and, third, we examine defendant's federal constitutional claims."

## A.  OEC 804(3)(c): Statements Against Penal Interest

■　　For a hearsay statement of an unavailable declarant to be admissible as a statement against penal interest, it must satisfy two broad criteria: First, the statement must "plainly [be] against [the declarant's] penal interest"—*i.e.*, it must subject the declarant to criminal liability. *Wilson*, 323 Or at 512. Second, the statement must be such that "a reasonable person in the declarant's position would not have made the statement unless the person believed it to be true." OEC 804(3)(c); *see also Wilson*, 323 Or at 513; *Franco*, 151 Or App at 477-78. That is, the statement must not only be *prima facie* inculpatory, but must also be circumstantially reliable. Because the circumstances surrounding Tregeagle's declaration and the content of that declaration are undisputed, we must determine, as a matter of law, whether those uncontested facts establish the two requisites for admissibility. *See Franco*, 151 Or App at 477 ("Because the facts are not in dispute, our function is to decide whether the trial court applied legal principles correctly to those facts.").

■　　Defendant first argues that Tregeagle's remarks regarding defendant's involvement were not *prima facie* self-inculpatory because "by the time Tregeagle made those statements, he had already given himself up by confessing to the aggravated murder." In other words, as we understand it,

---

[5] Defendant also contends that Tregeagle's remarks were not admissible as statements by a coconspirator. OEC 801(4)(b)(E). However, the trial court did not admit Tregeagle's statement on that ground, and the state does not urge OEC 801(4)(b)(E) as an alternative basis for admissibility and affirmance.

defendant contends that nothing Tregeagle said about defendant's involvement could, or did, subject Tregeagle to additional charges or enhanced punishment.[6]

Defendant's argument fails for at least two reasons. First, as defendant himself acknowledges:

"[T]he Supreme Court in *Nielsen*, and * * * *Wilson*, * * * and this court in *State v. Franco*, * * * held that under OEC 804(3)(c), a declarant's statements implicating another person in the course of making self-incriminating statements could be admitted in a prosecution of the other person. Indeed, in *Wilson* the Oregon Supreme Court explained that the United States Supreme Court's decision in *Williamson* [*v. United States*, 512 US 594, 114 S Ct 2431, 129 L Ed 2d 476 (1994)] is statutorily based, and expressly declined to follow it. *See Wilson*, 323 Or at 513 n 9."

We are not free to overrule *Nielsen* and *Wilson*.

Second, in all events, Tregeagle's entire confession, *including those portions implicating defendant*, subjected Tregeagle to criminal liability. Those portions of Tregeagle's confession recounting defendant's promise to be "there for him" and "cover his back" even if Tregeagle "had to shoot somebody" tended to subject Tregeagle to additional or different criminal liability. *See State v. Schutte*, 146 Or App 97, 102, 932 P2d 77 (1997) (statements against penal interest under OEC 804(3)(c) need not be confessions to a crime, but must simply "tend" to subject the declarant to criminal liability). In particular, those remarks potentially subjected Tregeagle to a conviction for criminal conspiracy to murder, ORS 161.450,[7] something the earlier portions of his confession did not do. Moreover, those remarks were uniquely

---

[6] Before the trial court, defense counsel contended:

"They already have [Tregeagle]. They have [defendant] testifying against him. They have his statements about what he saw. So they essentially had Mr. Tregeagle. If you look at his statement to them, I would submit that it's very interesting because in many cases it's clear that that's exactly what they want. They want to get [defendant]."

[7] ORS 161.450 states, in relevant part:

"(1) A person is guilty of criminal conspiracy if with the intent that conduct constituting a crime punishable as a felony or a Class A misdemeanor be performed, the person agrees with one or more persons to engage in or cause the performance of such conduct.

"(2) Criminal conspiracy is a:

explicit and damning admissions of Tregeagle's premeditation of the murder. Consequently, Tregeagle's remarks concerning defendant were *prima facie* contrary to Tregeagle's penal interest.

We next consider the statement's circumstantial reliability for purposes of OEC 804(3)(c)—*i.e.,* whether the circumstances surrounding Tregeagle's confessions "show that a reasonable person in [his] position would not have made the statements unless they were true." *Franco,* 151 Or App at 478. Although that circumstantial inquiry will vary in its details from case-to-case, we believe that the factors canvassed in *Franco* are similarly illuminating here: (1) whether the declarant had been read his *Miranda* rights; (2) whether the statement was given in response to police interrogation—and, if so, the duration and intensity of that interrogation; (3) whether the statements were made pursuant to an offer of leniency; (4) whether the statements exposed the declarant to the same level of criminal liability as the defendant; (5) whether the declarant either was unaware of the consequences or erroneously believed that the story would help him; (6) whether the statements contained a detailed account of the incident; and (7) whether the declarant's demeanor was either evasive or defensive. *Franco,* 151 Or App at 478-79.[8]

---

"(a) Class A felony if an object of the conspiracy is commission of murder, treason or a Class A felony."

[8] In *Franco,* we concluded that the declarant Love's statements were circumstantially reliable:

"After receiving his *Miranda* warnings, Love knew that his statement could be used in any prosecution against him. Nonetheless, he related the story even though he was not offered leniency in exchange for his statements, which would have given him an obvious reason to fabricate his story. Moreover, Love exposed himself to the same level of criminal liability as [the] defendant and gave a detailed account of the incident, directing Ball to the place Love parked and shot into the air, and to the actual location of the gun. There is no evidence to support the notion that Love believed that his story would help him, as the record contains no evidence that Love was unaware of the consequences he faced by making his statements or that Love knew what, if any, evidence the police had against him at that time. During the interview, Love did not act in an evasive, defensive, or combative manner and voluntarily responded to one basic, nonleading, question 'what had happened.' These circumstances do not suggest that Love believed that he needed to lie to help himself." *Franco,* 151 Or App at 478-79.

Here, as in *Franco*, Tregeagle's confession came after he had been advised of his *Miranda* rights and during police interrogation. However, the interrogation was neither protracted nor intense. As in *Franco*, Tregeagle gave a detailed account of the crimes and their circumstances, answering Zanni's questions candidly and nondefensively. There is absolutely no suggestion of a *"quid pro quo"* offer or implication of leniency.

Tregeagle did not attempt to shift liability to defendant or to minimize his own involvement. For example, when Zanni asked about defendant's involvement, Tregeagle said that if defendant "didn't know anything about [the murder], that would be cool with him," and that "[t]here was no reason for two of them being charged with this when it was his plan. He'd take the whole rap." Rather, with a single deviation, Tregeagle expressed a desire to take full responsibility for the crime, even knowing that his confession could result in the death penalty: "[The state] could throw him in the electric chair because it didn't bother him to kill somebody." We acknowledge, as we did in *Franco*, that it is always "possible" that a declarant could have acted on some undisclosed, hypothetical, or irrational countervailing motive to fabricate, *see Franco*, 151 Or App at 478, but nothing on this record suggests that occurred here.[9]

In sum, Tregeagle's statement, including his description of defendant's involvement, was circumstantially reliable. That statement was admissible under OEC 804(3)(c).

B. *Article I, Section 11, of the Oregon Constitution*

Under Article I, section 11, of the Oregon Constitution, a criminal accused is afforded the right "to meet the witnesses face to face." Where, as here, the state offers the statement of an unavailable declarant against the accused, that statement is admissible only if the statement bears "adequate indicia of reliability." *Franco*, 151 Or App at 479. That

---

[9] Although defendant suggests that Tregeagle might have implicated defendant because "misery loves company," the totality of Tregeagle's remarks demonstrates that he was committed to minimizing defendant's involvement. Indeed, if Tregeagle had been so perversely motivated, he could easily have ascribed much greater culpability to defendant.

requirement can, in turn, be satisfied by a showing that the statement either falls within a "firmly rooted hearsay exception" or contains "particularized guarantees of trustworthiness." *See State v. Campbell*, 299 Or 633, 648, 705 P2d 694 (1985) (adopting, for state Confrontation Clause purposes, the United States Supreme Court's reasoning in *Ohio v. Roberts*, 448 US 56, 65-66, 100 S Ct 2531, 65 L Ed 2d 597 (1980)).

■     Here, neither party argues that OEC 804(3)(c) constitutes a "firmly rooted hearsay exception," and no reported Oregon decision has resolved that question.[10] We need not do so in this case, because we agree with the state that Tregeagle's statement satisfied the alternative test for indicia of reliability—it contained sufficient "particularized guarantees of trustworthiness."

In *Franco*, we concluded that the declarant's out-of-court statement contained the requisite "particularized guarantees of trustworthiness" for purposes of Article I, section 11, because: (1) there was "no evidence of a countervailing motive to fabricate"; (2) the declarant "did not attempt to shift blame to defendant, but instead exposed himself to equally serious criminal liability"; and (3) there was no evidence that the statements were a product "of intimidation or a desire to 'curry favor' with the police." 151 Or App at 480; *see also Nielsen*, 316 Or at 623 (holding that a mixed-blame, custodial declaration contained particularized guarantees of trustworthiness because "the statement is strongly against declarant's penal interest and no countervailing motivation to fabricate is shown to be in operation").

As discussed in detail above, 171 Or App at 385, the same is true here. Tregeagle assumed complete responsibility for the killing and admitted that he planned and executed the crime "I shot the guy for the car"—while professing that defendant merely went along with the plan. While parenthetically acknowledging defendant's foreknowledge, Tregeagle went to great lengths to avoid inculpating defendant, saying that there "was no reason for two of them being

---

[10] *Accord State v. Wilson*, 323 Or 498, 514-15, 918 P2d 826 (1996) (declining to address the "firmly rooted hearsay exception" question because the statement contained particularized guarantees of trustworthiness).

charged with this when it was his plan," and that he would "take the whole rap." In short, viewed in their totality, Tregeagle's remarks belie any effort to curry favor with police and prosecutors by shifting or spreading blame to defendant. The admission of those remarks did not offend Article I, section 11.

C. *The Sixth Amendment to the United States Constitution*

■ ■   Finally, we address defendant's Sixth Amendment challenge. Although, as noted above, Oregon generally follows the *Ohio v. Roberts* analysis in applying Article I, section 11, *see Campbell*, the state and federal Confrontation Clause inquiries differ in at least two material respects. First, for Sixth Amendment purposes, an accomplice's mixed-blame statements made in response to police interrogation while in police custody are presumptively unreliable. *See Lee v. Illinois*, 476 US 530, 541-42, 106 S Ct 2056, 90 L Ed 2d 514 (1986). That presumption against admissibility can be rebutted upon a showing by the state that the factual circumstances underlying the statement bear "particularized guarantees of trustworthiness." *Roberts*, 448 US at 65-66. No Oregon court has recognized or applied a similar presumption for purposes of Article I, section 11. *See, e.g., Wilson*, 323 Or at 517 n 11.

■ ■   Second, under the Sixth Amendment, unlike Article I, section 11, the strongly self-inculpatory nature of the statement itself is not deemed to be an important indicator—*i.e.*, one of the "particularized guarantees"—of the statement's reliability. *See Wilson*, 323 Or at 517 (the United States Supreme Court "appears to preclude reliance on the general 'against penal interest' nature of a statement, without more, as an indicator of reliability with respect to portions of the statement inculpating someone other than the declarant"). Thus, the focus for Sixth Amendment purposes is on the circumstantial context of the statement and not on its substantive content. *Id.; see also Franco*, 151 Or App at 480 (the Sixth Amendment requires analysis of the particular circumstances in which the statement is made).

■   With the inquiry so framed, defendant acknowledges that, in *Franco*, we held that there were sufficient circumstantial guarantees of trustworthiness to satisfy the Sixth

Amendment. Defendant further does not dispute that the circumstances surrounding the coperpetrator's statement in *Franco* closely paralleled those here and indeed, are materially indistinguishable. Defendant argues, however, that the United States Supreme Court's intervening decision in *Lilly v. Virginia*, 527 US 116, 119 S Ct 1887, 144 L Ed 2d 117 (1999), so completely subverts our explicit and implicit Sixth Amendment analysis in *Franco* that *Franco* is no longer good law.[11] We disagree.

As recounted below, the Court in *Lilly* was deeply divided. In particular, none of the opinions, or portions of opinions, that defendant invokes commanded five votes. We decline to jettison our own precedent—much less to assume the invalidity of our own Supreme Court's controlling holdings—on such a fractured and nonauthoritative basis. *See State v. Farber*, 295 Or 199, 208 n 11, 666 P2d 821 (1983) ("a four-person plurality [of the United States Supreme Court] is not binding precedent").

In *Lilly*, the Court considered the admissibility of an out-of-court statement made by the declarant, who was also the defendant's brother. The declarant, the defendant, and a third man were all involved in series of robberies, a kidnapping, and a murder. All three were arrested, and, while in custody, the declarant was questioned by police. During the questioning, the police told the declarant that he would be charged with at least armed robbery and, perhaps, could face a life sentence unless he "broke family ties" and inculpated his brother. In response, the declarant admitted his involvement in the robberies, but said that his brother, the defendant, had both instigated the carjacking and shot the murder victim. *Lilly*, 527 US at 120-21. In the ensuing proceedings in Virginia state court, the trial court admitted the declarant's out-of-court statement over the defendant's Sixth Amendment Confrontation Clause objections. The defendant was convicted of capital murder.

---

[11] Although defendant does not say so expressly, the inescapable implication of his argument is that the Sixth Amendment analysis and holdings in *Nielsen* and *Wilson* must also be repudiated.

The Virginia Supreme Court affirmed both the conviction and the death sentence, holding that Virginia's statute allowing for the admission of declarations against penal interest was a firmly rooted exception to the hearsay rules and, thus, bore sufficient "indicia of reliability" to satisfy the federal Confrontation Clause.

The United States Supreme Court, generating five separate opinions, reversed. Justice Stevens authored the lead opinion, which held that the admission of the declarant's statements violated the federal Confrontation Clause. However, only three other justices—Justices Souter, Ginsburg, and Breyer—joined in the three parts of that opinion (Parts III, IV, and V) explaining their analysis of the constitutional admissibility of an alleged accomplice's "mixed-blame" statement against penal interest. That analysis forms the core of defendant's contention that *Lilly* has fundamentally altered Sixth Amendment jurisprudence.

Defendant particularly invokes four premises of Justice Steven's plurality opinion.

*First*:

"[A]ccomplices' confessions that inculpate a criminal defendant are not within a firmly rooted exception to the hearsay rule as that concept has been defined in our Confrontation Clause jurisprudence." *Lilly*, 527 US at 134.

*Second*:

"It is highly unlikely that the presumptive unreliability that attaches to accomplices' confessions that shift or spread blame can be effectively rebutted when the statements are given under conditions that implicate the core concerns of the old *ex parte* affidavit practice—that is, when the government is involved in the statements' production, and when the statements describe past events and have not been subjected to adversarial testing." *Id.* at 137.

*Third*:

"[A] suspect's consciousness of his *Miranda* rights has little, if any, bearing on the likelihood of truthfulness of his statements. When a suspect is in custody for his obvious involvement in serious crimes, his knowledge that anything

he says may be used against him militates against depending on his veracity." *Id.* at 138.

*Fourth*:

"[T]he absence of an express promise of leniency to [declarant] does not enhance his statements' reliability to the level necessary for their untested admission. The police need not tell a person who is in custody that his statements may gain him leniency in order for the suspect to surmise that speaking up, and particularly placing blame on his cohorts, may inure to his advantage." *Id.* at 138-39.

None of those over-arching propositions was endorsed by a majority of the Court. Rather, the concurring opinions of the other justices explicitly express their unwillingness to join the plurality's expansive analysis. For example, Justice Scalia, writing alone, noted that the particular facts presented—where the declarant, after being threatened that he faced extreme sanctions unless he "broke family ties," admitted that he was guilty of robbery but shifted sole blame for the murder to the defendant—created a "paradigmatic Confrontation Clause violation." *Lilly*, 527 US at 143 (Scalia, J., concurring). Justice Scalia did not join in any of the substantive analysis of Justice Stevens's opinion.

Chief Justice Rehnquist, in an opinion joined by Justices O'Connor and Kennedy, concurred only in the judgment. He suggested that the plurality erred in making any substantive analysis of the Confrontation Clause issue, because the portions of the declarant's statement inculpating the defendant for murder were not against the declarant's penal interest for Confrontation Clause purposes.[12] Chief Justice Rehnquist decried the majority's substantive analysis as overreaching: "The plurality's blanket ban on the government's use of accomplice statements that incriminate a defendant * * * sweeps beyond the facts of this case and our precedent * * *." *Id.* at 147. The Chief Justice concluded:

---

[12] Particularly, the Chief Justice noted:

"There may be close cases where the declaration against penal interest portion is closely tied in with the portion incriminating the defendant, * * * but this is not one of them. Mark Lilly's statements inculpating his brother in the murder * * * are not in the least against Mark's penal interest." *Lilly*, 527 US at 145-46 (Rehnquist, C. J., concurring).

"Unlike the plurality, I would limit our holding here to the case at hand, and decide only that [the declarant's] custodial confession laying sole responsibility on petitioner cannot satisfy a firmly rooted hearsay exception." *Id.*

Finally, Justice Thomas filed his own concurring opinion in which he agreed generally with Chief Justice Rehnquist's suggestion that the plurality's opinion amounted to unnecessary overreaching. *Lilly*, 527 US at 143-44.[13]

In sum, the *holding* in *Lilly* does not contradict our Sixth Amendment analysis in *Franco*, much less *Nielsen* or *Wilson*, and the plurality's *reasoning* is not "binding as precedent." *Farber*, 295 Or at 208 n 11.[14] *Franco, Wilson,* and *Nielsen* remain good law. Tregeagle's statement bore the "particularize guarantees of trustworthiness" necessary to satisfy the Sixth Amendment.

The trial court properly admitted Zanni's recounting of Tregeagle's confession, including those portions that inculpated defendant.[15]

Affirmed.

---

[13] In addition, Justice Breyer wrote separately to note that while the facts in *Lilly* did not require the Court to "reexamine the current connection between the Confrontation Clause and the hearsay rule," the issue remained unresolved: "I write separately to point out that the fact that we do not reevaluate the link in this case does not end the matter. It may leave the question open for another day." *Lilly*, 527 US at 142-43 (Breyer, J., concurring).

[14] *See also State v. Holmes*, 342 SC 113, 536 SE2d 671 (2000) (declining to follow *Lilly* plurality "because of the fractured nature of the * * * decision").

[15] Given our disposition, we do not reach, and imply no view as to, the state's alternative argument that the evidence of defendant's guilt was so overwhelming that the admission of Tregeagle' statement was, at worst, harmless error.