Argued and submitted January 30, reversed and remanded for new trial
April 10, 2002

## STATE OF OREGON,
*Respondent,*

*v.*

## TIMOTHY ELIAS ESPINOSA,
*Appellant.*

## 98C51963; A106660

43 P3d 1155

Susan F. Drake, Deputy Public Defender, argued the cause for appellant. With her on the brief was David E. Groom, Public Defender.

Janet Klapstein, Assistant Attorney General, argued the cause for respondent. With her on the brief were Hardy Myers, Attorney General, and Michael D. Reynolds, Solicitor General.

Before Haselton, Presiding Judge, and Linder and Wollheim, Judges.

HASELTON, P. J.

## HASELTON, P. J.

Defendant appeals his convictions on two counts of aggravated murder. ORS 163.095. Defendant's assignments of error pertain to the admission into evidence of hearsay statements of the two people defendant was with immediately before and after the murders. The state concedes that certain admissions by defendant's companions should not have been admitted into evidence as statements against penal interest, OEC 804(3)(c), but argues that the admission of those statements was harmless. We conclude that the erroneous admission of the disputed statements was not harmless. Consequently, we reverse and remand.

Defendant was found guilty after a jury trial. Viewed most favorably to the state,[1] the evidence at trial established the following facts: On the evening of October 11, 1998, defendant and his two companions, Raul Ybara and Enrique Rivera, were cruising around in Ybara's car in the vicinity of Sunnyview Road and Lancaster Drive in northeast Salem. Defendant, Ybara, and Rivera were looking for members of a gang known as the Brown Pride Tokers with the intention of fighting with them. Several days earlier, one of their friends had been attacked by members of the Tokers— and several days before that, defendant had been involved in a fight with members of the same gang.

As defendant and his companions drove west on Sunnyview Road, they saw Fidencio Ceja and Juan Torres, whom they believed were associated with the Brown Pride Tokers. Defendant told Ybara to stop the car, and he got out. Several minutes later, defendant shot and killed both Ceja and Torres. Ceja was shot twice in the chest and once in the groin. Torres's body was found several hundred feet away from Ceja's body. Torres had been shot through the arm, back, and abdomen and had a bicycle chain wrapped around his wrist and hand at the time of his death. A witness at the scene heard someone yell "fuck 'toilets' "—a derogatory term

---

[1] *See State v. Charboneau*, 323 Or 38, 40-41, 913 P2d 308 (1996). *Accord State v. Cunningham*, 179 Or App 359, 361 n 2, 40 P3d 1065 (2002) (addressing application of *Charboneau* standard of review).

for Brown Pride Tokers—near the time and place of the shooting.

Defendant, Ybara, and Rivera were first brought in for questioning on October 20, about a week after the shooting. Each gave the police accounts of what happened before and after defendant left the car.

Ybara initially denied any involvement but subsequently told police that, when defendant had asked to be let out of the car, defendant said that "he wanted to get some fools." Ybara stated that he believed that defendant was going to fight the two boys they believed to be associated with the Brown Pride Tokers. According to Ybara, he did not see that defendant had a gun when he left the car, but he knew that defendant often carried a gun inside his pants.

Ybara also told police that, when defendant left the car, defendant asked Ybara to pick him up at a nearby Albertson's store in a while. According to Ybara, defendant came to the Albertson's store a few minutes later, got into the car, and said: "I bucked the fools." Ybara stated that when defendant used the word "bucked," he meant "shot."

Ybara also recounted another encounter with defendant later that same week, in which defendant described the shootings to a group of friends. According to Ybara, defendant told the group that he had approached the victims and offered to sell them marijuana. Defendant told his friends that the victims agreed to move to a darker area for the marijuana sale and, when the victims asked to see the marijuana, defendant pulled out his gun and shot them.

Rivera also gave the police a statement on October 20. He said that he and defendant were passengers in Ybara's car on the evening of October 11 and that, as they were driving down Sunnyview, defendant asked to be let out of the car to "talk to some fools." Rivera was pretty sure that defendant had a gun. Rivera thought that defendant was going to sell dope to the "fools." According to Rivera, defendant asked Ybara to pick him up at Albertson's—and, when defendant got into the car at Albertson's, defendant told Rivera and Ybara: "I bucked 'em." Rivera also stated that defendant described the shooting several days later, saying

that he had asked the victims if they wanted to buy some "dope," and then shot them.

The police interviewed defendant later on October 20, and told defendant what Ybara and Rivera had said. Defendant initially denied any knowledge of the shooting but then admitted to his involvement. Defendant said that he, Ybara, and Rivera had been driving down Sunnyview, looking for gang members to fight, when they saw "two fools." Defendant decided that he should "beat these fools down" and told Ybara and Rivera that he was going to "serve them [the victims] up."

Defendant told police that he then got out of the car, approached the victims, and asked them if they would be interested in buying marijuana. They agreed, and the three moved off to a darker, secluded area off the street. Defendant was nervous because he thought that he recognized one of the two victims as someone he had fought with in the past. According to defendant, the victims began speaking to one another in Spanish, which caused defendant further concern because he did not understand Spanish. One of the victims produced $40 for purchase of the marijuana, first holding out the money to defendant then pulling it back, which made defendant more nervous. At that point, according to defendant, the other victim then began to take one of his hands out of his front pants pocket, and defendant thought that he was pulling out a handgun. Because defendant believed that that victim was going to shoot him, he pulled out his own handgun and fired several shots at the victim who he believed was pulling out a gun. Defendant then turned his gun on the other victim and fired several more shots.

The next day, October 21, Rivera had a second interview with the police. Rivera stated that he, Ybara, and defendant were driving around looking for Tokers in order to get even for a fight that had occurred the day before. Rivera saw that defendant had a gun with him. As they were driving down Sunnyview, defendant said something about some "fools." According to Rivera, when defendant got out of the car: "He said, I'm going to go shoot these people, I think." Rivera did not really believe that defendant was going to do it, but he did not go with defendant because he did not want

to be there if defendant shot the victims. When defendant returned to the car, he said: "I shot those fools," or used the word "bucked" or "blasted." According to Rivera, defendant also said that he had shot one of the victims, who had fallen over dead, and then shot the other victim as that victim was running away.

On December 14, Ybara made a second statement to the police. The content of that statement was similar to Ybara's October 20 statement: Ybara indicated that, as they were driving down Sunnyview, defendant had said something like "there's two fools right there." Defendant then asked to be let out, and told Ybara to pick him up at Albertson's in five or 10 minutes. According to Ybara, Rivera also got out of the car with defendant and, after Ybara drove around the area, Rivera returned to the car, saying that they should pick defendant up at the Albertson's. Ybara told police that he did not think that defendant was going to shoot the victims, but he did think that it was a possibility. When defendant got back to the car, he told Ybara that he had shot one of the victims and he did not know if he hit the other one because that one had been running away. Finally, Ybara again described defendant's recounting of the shooting to friends several days after the shooting.

At trial, the state presented evidence of each of the statements described above after Ybara and Rivera both refused to testify, invoking their rights under the Fifth Amendment to the United States Constitution. The trial court admitted those hearsay statements under OEC 804(3)(c), "the statement against penal interest" exception to the hearsay rule.

At trial, the prosecution also introduced evidence of Ybara's testimony before the grand jury that indicted defendant. A member of the grand jury recounted that Ybara had testified that: (1) defendant usually carried a gun; (2) defendant had wanted to go to a location where Tokers hung out, and defendant and Rivera had left the car at that location; (3) after defendant was picked up at Albertson's, defendant had said that he had "bucked" the victims; and (4) several days after the shooting, defendant had said that he had approached the two victims on the pretense of selling some

"bud" and then, after they moved to the bushes, defendant had pulled out his gun, shot one, and then shot the other as he started to run away.

Defendant also testified at trial and gave a different version of the events surrounding the shooting. Defendant stated that he, Ybara, and Rivera had been in the car driving on Sunnyview when Ybara spotted the two victims. According to defendant, Ybara wanted to stop the car and for the three of them to attack the two victims, but defendant said "no, no," and "keep going, keep going." Ybara stopped the car, and defendant and Rivera got out. Defendant testified that he intended to find out who the victims were—and, particularly, if one of them was the youth who had hit Ybara in the face in the previous fight. Defendant told Rivera to tell Ybara to pick him up at Albertson's, and Rivera returned to the car.

According to defendant, he then approached the victims and asked them if they wanted to buy some marijuana. The victims spoke to each other in Spanish, and one of them spoke to defendant in English. They agreed on a price for an ounce of marijuana and then went to a dark area near an apartment. Defendant testified that, as the two victims were speaking to one another in Spanish, he heard one of them say something like "BPT." Defendant then heard a metallic sound and saw something glint in the left hand of the other victim. At that point, according to defendant, he pulled out his gun and shot first at the victim in front of him. He thought that victim shot back at him. Defendant then remembered the second victim, became afraid that he would start shooting at defendant, and turned and shot at the second victim, as well. Defendant testified that he did not shoot the second victim as the victim was running away.

Defendant acknowledged that, when he returned to the car, he told Rivera and Ybara that he had "bucked" the victims. Defendant further acknowledged that, the week after the shooting, he told friends that he had shot the victims after pretending that he was going to sell the marijuana. Defendant testified that those statements were not true— that friends had asked questions about the shooting while he

was drunk and that he had lied to impress them. On cross-examination, defendant acknowledged that, before the shooting, he had said to Rivera: "I should beat these fools down."

The jury ultimately convicted defendant of two counts of aggravated murder, one count for each of the two victims. The court sentenced defendant to two consecutive life sentences, each with a possibility of parole after 30 years. This appeal followed.

On appeal, defendant raises numerous assignments of error concerning the admission of Ybara's and Rivera's out-of-court statements. We need not, and do not, dwell on the particulars of those arguments. The state concedes that Rivera's statements in their entirety were not admissible and that substantial portions of Ybara's statements were not admissible. We accept those concessions as well founded but conclude, further, that Ybara's statements were not admissible in their entirety. Further, and contrary to the state's arguments, we conclude that, regardless of the admissibility of any statements by Ybara, the erroneous admission of Rivera's statement that defendant declared "I'm going to go shoot these people, I think" was so prejudicial that the admission of that statement, even by itself, constituted reversible error.

OEC 804(3) provides, in part:

"The following are not excluded by [OEC 802] if the declarant is unavailable as a witness:

"* * * * *

"(c)   A statement which was at the time of its making so far contrary to the declarant's pecuniary or proprietary interest, or so far tended to subject the declarant to civil or criminal liability, or to render invalid a claim by the declarant against another, that a reasonable person in the declarant's position would not have made the statement unless the person believed it to be true. A statement tending to expose the declarant to criminal liability and offered to exculpate the accused is not admissible unless corroborating circumstances clearly indicate the trustworthiness of the statement."

To establish admissibility under that exception, the proponent of the hearsay statement must show: (1) the declarant is unavailable; (2) the statement was "plainly" against the declarant's penal interest, in that it subjected the declarant to criminal liability; and (3) the statement is one that "a reasonable person in the declarant's position would not have made * * * unless the person believed it to be true." OEC 804(3)(c); *State v. Wilson*, 323 Or 498, 512-13, 918 P2d 826 (1996), *cert den* 519 US 1065 (1997); *see also State v. Jones*, 171 Or App 375, 15 P3d 616 (2000), *rev den* 332 Or 56 (2001).

Here, the "unavailability" requirement is satisfied. At least with respect to the substance of their statements, Ybara's and Rivera's invocation at trial of the privilege against self-incrimination rendered them "unavailable" for purposes of OEC 804(3). *See* OEC 804(1)(a) (a declarant is unavailable if the declarant is exempted from testifying on the ground of privilege).[2]

At trial, the prosecutor summarized the state's position that the disputed statements were admissible because they tended to subject both declarants to criminal liability:

> "Your Honor, [Ybara] has pled guilty to hindering prosecution in this case and is pending sentencing on that for his actions in driving the defendant away from the scene with knowledge. He also faces potential conspiracy to commit aggravated murder charges in this case should enough evidence be developed to establish that he was part of the plan for this. The same would apply to Mr. Rivera. Mr. Rivera's currently incarcerated and is pending trial on assault charges from an earlier shooting[.]"

The prosecutor further stated: "Your Honor, as far as looking at the area of criminal liability on Mr. Ybara's part, I would

---

[2] Defendant does not dispute that Ybara and Rivera were unavailable for purposes of the admissibility of the substance of their statements, *viz.*, their descriptions of their own conduct and their recounting of defendant's statements in their presence. However, defendant does contend in his first two assignments of error that the trial court improperly precluded defense counsel from cross-examining Ybara and Rivera concerning the circumstances surrounding their police interviews and, specifically, that Ybara's and Rivera's invocation of their Fifth Amendment privilege did not render them "unavailable" for purposes of *that* cross-examination. Given our analysis and disposition of the appeal—and because it is uncertain whether that question will recur on remand—we need not, and do not, address and decide those assignments of error.

submit to this court that his—that the focus is not the hindering prosecution potential liability, but rather the conspiracy to commit aggravated murder[.]"

The state's position on appeal is very different. On appeal, the state concedes that the admission of all of Rivera's statements and substantial portions of Ybara's statements was erroneous in that the substance of those remarks was not contrary to the declarant's penal interest. The state argues, nevertheless, that that error was harmless when viewed in the totality of the evidence, especially including defendant's own admissions to the police and defendant's testimony at trial.

■       We begin with the statements of Rivera, the passenger. On appeal, the state acknowledges:

> "The state's theory of admissibility for the statements of both Rivera and Ybara was grounded on accomplice liability. *See* ORS 161.155. Yet in the course of Rivera's statements, he acknowledged nothing that would have made him vicariously liable for either assault or homicide."

The state concedes, particularly, that Rivera's admissions established nothing more than "mere presence" or "acquiescence" in defendant's alleged crimes and that, as such, "the statements were simply not against his penal interests." We accept that concession as well-founded. *See, e.g., State v. Lopez-Medina*, 143 Or App 195, 923 P2d 1240 (1996) (mere presence at the scene of an offense is insufficient basis for accomplice liability). Thus, the trial court erroneously admitted Rivera's statements, including his account in his second interview that, when defendant got out of the car, defendant said, "I'm going to shoot these people, I think."

■       We proceed to the statements of Ybara, the driver. With respect to Ybara, the state posits, and we agree, that the substance of only two of Ybara's statements were "plainly against [his] penal interest": (1) that Ybara, knowing that defendant intended to fight the victims, dropped defendant off near the victims and agreed to pick him up afterward; and (2) that Ybara, knowing that defendant had shot the victims, drove defendant away from the scene of the crime. The first admission potentially subjected Ybara to accomplice liability

for the attacks on the victims, and the second was an admission of the crime of hindering prosecution. *See* ORS 162.325(1)(c) (a person commits the crime of hindering prosecution if the person provides transportation to someone who has committed a felony in order to avoid apprehension). The remainder of Ybara's remarks, including his account of what defendant had said after the murder about using the marijuana buy as a ploy to lure the victims to their deaths, were inadmissible under OEC 804(3)(c), because they were not statements against Ybara's penal interest.

We thus conclude that both of Rivera's statements to the police and substantial portions of Ybara's remarks to the police and before the grand jury were erroneously admitted under OEC 804(3)(c) because they were not plainly against the declarants' penal interest. *Wilson*, 323 Or at 512.

■ We turn, then, to the question of whether the two admissions identified above as plainly against Ybara's penal interest satisfy the final requirement for admissibility—*viz.*, that "a reasonable person in the declarant's position would not have made the statement unless the person believed it to be true." OEC 804(3)(c); *Wilson*, 323 Or at 513. That inquiry focuses on whether, under the circumstances, the statements can be deemed reliable or trustworthy. *See, e.g., Jones*, 171 Or App at 382. Numerous circumstances may be relevant to that inquiry. In *State v. Nielsen*, 316 Or 611, 619-20, 853 P2d 256 (1993), the court acknowledged that the legislative commentary to OEC 804(3)(c) recognized that:

> " 'A statement admitting guilt and implicating another person, *made while in custody*, may well spring from a desire to curry favor with the authorities and hence fail to qualify as being against the declarant's interest.' " (Emphasis in original.)

The court went on, however, to conclude that the statement made by a declarant in custody in that case was sufficiently trustworthy because the declarant's statement "admitted her equally culpable involvement, rather than trying to shift blame." 316 Or at 620.

In *Jones*, we also considered the circumstantial reliability of statements made by a declarant who was in custody

at the time. There, the declarant's statements were primarily self-inculpatory: He acknowledged that he, personally, had killed the victim. 171 Or App at 378. However, he also made statements that he and the defendant had discussed the possibility that the victim would be shot in the course of the carjacking that they were planning, and that the defendant promised to support the declarant and " 'watch his back' in whatever decision he made, including the potential killing." *Id.* In examining the circumstantial reliability of those statements, we enumerated seven factors that bear on the inquiry:

> "(1) whether the declarant had been read his *Miranda* rights; (2) whether the statement was given in response to police interrogation—and, if so, the duration and intensity of that interrogation; (3) whether the statements were made pursuant to an offer of leniency; (4) whether the statements exposed the declarant to the same level of criminal liability as the defendant; (5) whether the declarant either was unaware of the consequences or erroneously believed that the story would help him; (6) whether the statements contained a detailed account of the incident; and (7) whether the declarant's demeanor was either evasive or defensive." *Id.* at 384 (citing *State v. Franco*, 151 Or App 472, 478-79, 950 P2d 348 (1997), *rev den* 326 Or 465 (1998)).

After evaluating those circumstances, we concluded that the declarant's statements were circumstantially reliable and, thus, admissible under OEC 804(3)(c). We emphasized, particularly, that although the declarant had received *Miranda* warnings, the police interrogation was neither protracted nor intense. 171 Or App at 385. We further observed that no offers of leniency had been made and that the declarant had given a detailed account of the circumstances of the crimes. *Id.* Finally—and perhaps, most significantly—we noted that the declarant, rather than trying to shift blame to the defendant, "expressed a desire to take full responsibility for the crime, even knowing that his confession could result in the death penalty." *Id.*

In *Franco*, similarly, we concluded that a declarant's statements were circumstantially reliable. There, the declarant and two others robbed a convenience store. 151 Or App at 475. The declarant made statements indicating that he agreed to drive while the others ran in and stole beer. The

others came out of the store with a clerk in pursuit, and the defendant told the declarant to shoot his gun into the air to scare the clerk, which the declarant did. *Id.* The declarant further described to police where the group had disposed of the gun. *Id.* We concluded that the statements were plainly against the declarant's penal interest, given his admitted knowledge of, and participation in, the robbery. *Id.* at 478. As to indicators of circumstantial reliability, we noted that the declarant had received *Miranda* warnings, but further noted that he was not offered leniency, that he exposed himself to the same level of criminal liability as the others, that he gave a detailed account of the incident, and that there was no evidence to support the notion that the declarant believed that his story would help him. *Id.* at 478-79. Finally, we noted that the declarant was not evasive, defensive or combative during the interview; rather, he had responded voluntarily. *Id.* at 479.

■ We return to the circumstances of this case—and begin with those surrounding Ybara's first statement to the police. As noted, Ybara was first interviewed by two detectives at the police station on the morning of October 20, 1998. Before the interview began, one of the detectives read defendant his *Miranda* rights and told him that he was not under arrest. The detectives told Ybara that he could be subject to criminal liability for his involvement in the shooting. At first, Ybara indicated that he had heard about the shooting from his girlfriend, but that he was not in the area at the time. Ybara then began asking hypothetical questions as to what would happen to people who had different amounts of involvement in a crime. One of the detectives told Ybara that he was not there to discuss any type of deal with Ybara and that he had no doubt that Ybara was going to face some type of consequences. The detective acknowledged that Ybara was under a lot of pressure to give a statement. Eventually, Ybara admitted to his involvement, as described above, after which the officers taped his statement. During the interview, Ybara's demeanor was "disinterested" and "kind of slumped down, looks at the table a lot. He would spend a lot of time yawning like—like I'm bored with this."

Thus, applying *Franco*'s seven-factor inquiry to those facts: (1) Ybara gave his first statement after he was

read his *Miranda* rights and in the course of a police interrogation. (2) There is no evidence of the exact length of the interrogation; however, it was long enough for Ybara to first deny involvement in the crime, then ask hypothetical questions about levels of involvement, and, finally, give a statement, followed by the taped statement. One of the officers testified that Ybara was "under a lot of pressure" to give a statement. (3) There is no evidence that Ybara's statement was made pursuant to an offer of leniency. (4) The statement did not expose Ybara to the same level of criminal liability as the defendant. (5) Given that Ybara asked hypothetical questions concerning liability for the crimes, we must conclude. that he had at least some awareness of the consequences, and may have believed that cooperation—or ostensible cooperation—would benefit him. (6) The statement contained a fair amount of detail concerning the group's activities up to the point when defendant left the car, but necessarily contained few details of the crime itself as Ybara did not claim to be present when the crime was committed. (7) Ybara's demeanor, described by one of the detectives as "disinterested," involved looking at the table and yawning. The record also discloses that a number of Ybara's responses were mumbled or inaudible.

The totality of those circumstances is very different from those in *Franco* or *Jones*. Indeed, the only factor enumerated in *Franco* that would support admissibility of Ybara's inculpatory admissions in his first statement is that that statement was not given in response to an offer of leniency. In assessing the totality of the circumstances, we find it particularly significant that Ybara implicated defendant in the shootings only after asking questions exploring his own potential exposure—and then did so in a fashion that effectively minimized his own participation. In that critical regard, this case is materially, and ultimately, distinguishable from *Franco* and *Jones*. We thus conclude that the state failed to establish the reliability of Ybara's first statement, including its ostensibly self-inculpatory admissions. Thus, the trial court erred in admitting that statement.

We reach the same conclusion with respect to Ybara's second statement to the police (during which his attorney was present) and his later grand jury testimony.

The content of those later statements did not differ significantly from Ybara's first statement. Although some of the factors might be analyzed slightly differently, there is no indication that any of the factors enumerated in *Franco* was more or less compelling when the later statements were made than when the first statements were made.

We thus conclude that the trial court erroneously admitted into evidence Rivera's and Ybara's out-of-court statements. For the reasons that follow, we further determine that that error was not harmless.

Evidentiary error is not presumed to be prejudicial. OEC 103(1). The state argues that, given defendant's own statement to the police and his subsequent trial testimony, the improperly admitted statements by Ybara and Rivera were merely cumulative and therefore not prejudicial. We disagree.

■  Defendant was convicted of two counts of aggravated murder. Central to the state's theory of the case was that both of the shootings were premeditated. Defendant, as noted, relied on a defense of self-defense. The state presented circumstantial evidence of premeditation, including: the history of antagonism and recent violence between defendant and his friends and members of the Brown Pride Tokers; the fact (admitted by defendant) that he, Ybara, and Rivera, were driving around looking for members of that gang; and the fact that defendant was carrying a gun. However, the only direct, contemporaneous evidence of defendant's alleged premeditation was Rivera's statement that, as defendant got out of the car, defendant said, "I'm going to shoot these people, I think." That statement, which defendant denied making, explicitly contradicted defendant's defense and account that the shootings were the unpremeditated product of self-defense in a drug deal gone bad. Even given defendant's own admissions as to other matters described in Rivera's and Ybara's statements, that aspect of Rivera's account is so central and prejudicial to defendant's defense, and to his credibility, that its admission cannot be deemed harmless.

We further reject the state's alternative argument that, even if the error was not harmless as to the killing of one victim, it nonetheless was harmless as to the killing of

the other victim. As noted, Torres had a bicycle chain wrapped around his hand, and there was evidence from which the jury could find that defendant believed that Torres had a gun. Thus, the state argues that defendant's self-defense argument, even if believed, could apply only to the person whom defendant believed had a weapon, but not to the shooting of the other victim. Consequently, the state asserts, defendant's conviction on the count of aggravated murder pertaining to the murder of Ceja must be affirmed.

That argument is unavailing for several reasons. First, the aggravated murder charges were interdependent. In charging those crimes as aggravated murder, the indictment was based on the portion of the aggravated murder statute that elevates a murder to aggravated murder when "[t]here is more than one murder victim in the same criminal episode[.]" ORS 163.095(1)(d). If a retrial is required as to one of the killings, then the aggravated murder conviction for the other based on ORS 163.095(1)(d) cannot stand.

Moreover, even assuming that we could remove from the equation the multiple-victim factor that elevates the crime to aggravated murder and affirm the other conviction as a lesser crime (for example, murder as described in ORS 163.115), we would be able to do so only if we could determine that the jury necessarily found every element of that crime to be established. The statement by Rivera that defendant intended to shoot the victims before he left the car did not simply negate defendant's defense of self-defense, but, as noted, also provided evidence of premeditation. The jury in this case was instructed not only as to the elements of aggravated murder, but also as to the elements of first- and second-degree manslaughter. We have no way of knowing whether, without the disputed evidence, the jury would have convicted defendant of murder or manslaughter on these facts. We thus conclude that the error in admitting Rivera's and Ybara's statements requires reversal of both convictions and remand for a new trial on both counts.

Reversed and remanded for new trial.